**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Jody Myesha ORSO, Defendant–Appellant.**

**No. 99–50328.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 21, 2001

Filed Sept. 17, 2001

Elizabeth A. Newman (argued), Emily S. Uhrig, and Maria E. Stratton, Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Ronald L. Cheng (argued), Wendy O. Clendening, and Alejandro Mayorkas, United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: SCHROEDER, CHIEF JUDGE, AND HUG, KOZINSKI, O'SCANNLAIN, KLEINFELD, HAWKINS, MCKEOWN, GOULD, PAEZ, TALLMAN, and RAWLINSON, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Concurrence by Judge PAEZ

O'SCANNLAIN, Circuit Judge:

We must decide whether a Mirandized confession by a suspect in custody must be suppressed because it immediately followed her arguably incriminating un-Mirandized statements.

I

While delivering mail, Vicki Orr, a postal letter carrier, was approached by Jody Myesha Orso. Orso demanded that Orr produce her arrow keys, used to open United States Postal Service ("USPS") collection boxes and group mailboxes at apartment buildings. Orr surrendered the keys to Orso, who fled on foot.

The USPS began an investigation. After USPS Inspectors Anthony Galetti and Shawn Tiller obtained information that made Orso a suspect, they left their cards at her residence, requesting that she call them. Orso responded to the request and spoke with Inspector Tiller by telephone.

Shortly thereafter, a federal arrest warrant was issued for Orso for robbery of a postal letter carrier. More than two months later, Orso was arrested by Redondo Beach police officers on unrelated charges and taken to the Redondo Beach Police Department. The arresting officers, upon learning of the federal warrant, notified Inspector Galetti that they were holding Orso. Inspectors Tiller and Galetti took Orso into their custody and drove her to the Postal Inspection Service Office ("office") to conduct a formal interview.

Orso was handcuffed and placed in the back seat of the vehicle for the length of the drive from the police station to the office, which took between 25 and 35 minutes. It is undisputed that Orso was not informed of her *Miranda* rights at any time before or during the car ride.

For the first 15 minutes of the drive, the inspectors and Orso engaged in conversation unrelated to the actual robbery. About half-way through the ride, Inspector Galetti began to discuss the robbery with Orso. According to Inspector Galetti, he preceded his comments by admonishing Orso not to say anything. He proceeded to inform her of the evidence implicating her in the robbery. Inspector Galetti later admitted that he lied to Orso during this colloquy, telling her that a witness to the robbery thought that she might have seen a gun used, even though he knew of no such evidence. Inspector Galetti then informed Orso that the maximum statutory penalty for armed robbery of a letter carrier was 25 years incarceration. He also told her that he did not believe that she used a gun, and that the statutory maximum penalty for unarmed robbery of a letter carrier was ten years, but that a more realistic sentence for unarmed robbery would be five years. Orso responded by saying, "Oh, I can do five years."

Inspector Galetti then informed Orso that the letter carrier had identified her as being the robber. In response to this statement, Orso said she "had never stood in a lineup before." Inspector Galetti continued, explaining that it was actually a picture of her that the letter carrier picked out. Inspector Galetti then told Orso that others involved in the robbery had identified her. At that point, Orso allowed, "Well, if the letter carrier said it's me, then it must be me." Inspector Galetti also told Orso that an individual named Main was believed to be the driver of the car involved in the robbery. When Orso indicated that she did not know anybody by that name, Inspector Galetti began to describe Main's appearance, to which Orso replied, "Oh, the gold-toothed boy."

Upon arrival at the office, Orso asked the inspectors if they would allow her to see her two-year old daughter. Inspector Tiller testified that he told her she "proba-

bly" could. Indeed, before transporting Orso to the detention center, the inspectors took Orso to see her daughter.

Soon after the inspectors arrived at the office with Orso, and only a little more than ten minutes after she made the statements in the car, the inspectors read her the *Miranda* warnings, and she immediately waived her rights by signing a standard form. The inspectors then interviewed Orso for approximately one and a half hours, during which time she fully confessed to her involvement in the robbery.

A federal grand jury returned a one-count indictment charging Orso with unarmed robbery of a postal letter carrier in violation of 18 U.S.C. § 2114(a). Orso initially entered a plea of not guilty. She then moved to suppress both the statements she made in the car prior to receiving the *Miranda* warnings and the post-warning statements she made at the office. The district court held a hearing on the motion and, after taking evidence from the inspectors and Orso, denied the motion with respect to both sets of statements. Orso subsequently entered a conditional guilty plea, and was sentenced to a term of 37 months in prison. She timely appeals the district court's order denying her motion to suppress.

## II

■ Orso argues that the district court erred by failing to suppress the statements she made while riding in the back seat of the car and before she had been read the *Miranda* warnings. Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Orso's unwarned statements must be suppressed if they were elicited while she was in custody, and under interrogation. *Id.* at 444, 86 S.Ct. 1602. On appeal, the United States concedes Orso was in custody while in the car, and disputes only whether she was under interrogation.[1]

■ "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682 (footnote omitted). During the car ride, and without giving the *Miranda* warnings, Inspector Galetti engaged Orso in several minutes of detailed discussion regarding the evidence against her, the witnesses against her, and the statutory penalties for the crime of which she was suspected. Indeed, he went so far as to make up some of the evidence which he said existed against her. Although Inspector Galetti testified that he preceded his comments by admonishing her not to speak, we are persuaded that he should have known that it was reasonably likely his comments would cause her to respond. It is hard to see any purpose for the long

---

1. The district court denied Orso's motion to suppress these statements because it found the statements not to be "incriminating." In *Miranda*, however, the Court admonished us not to try to discern "degrees of incrimination," noting that the Constitution "protects the individual from being compelled to incriminate himself in any manner...." 384 U.S. at 476, 86 S.Ct. 1602. "[N]o distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the *prosecution*." *Id.* at 477, 86 S.Ct. 1602 (internal quotation marks omitted); *see also Rhode Island v. Innis*, 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("By 'incriminating response' we refer to any response-whether inculpatory or exculpatory-that the prosecution may seek to introduce at trial.").

and detailed discussion in the car, especially his false statement of the evidence against Orso, other than to elicit incriminating responses from her. Inspector Galetti conceded as much in the evidentiary hearing before the district court; in explaining his delay in administering the *Miranda* warnings, he testified: "we wanted to eventually speak with Miss Orso and thought that if we Mirandized her right away that she might not want to speak with us." Accordingly, we hold that Orso was under interrogation while she was in the car, and, therefore, the statements she made prior to the *Miranda* warnings must be suppressed.

### III

Orso also argues that the district court erred by failing to suppress her full confession at the office. Although the inspectors read Orso her *Miranda* rights prior to receiving her full confession, Orso none-

theless contends that her confession should be suppressed because it was "tainted" by the *Miranda* violation surrounding her earlier statements in the car.[2]

### A

The Supreme Court considered a similar question in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* the police elicited a confession from a suspect prior to giving him the *Miranda* warnings, but then, after receiving the *Miranda* warnings, he confessed a second time. *Id.* at 300–02, 105 S.Ct. 1285. The question there, as here, was whether the second confession was inadmissible because it was the fruit of the tainted first confession. The Court concluded that the "fruit of the poisonous tree" doctrine does not operate in the *Miranda* context in the same way that it does in the Fourth Amendment context.[3] *Id.* at 306–309, 105

---

**2.** The roots of the doctrine requiring courts to suppress evidence as the tainted "fruit" of unlawful governmental conduct can be traced to *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In that case, the Supreme Court extended the exclusionary rule to apply not only to evidence obtained as a result of illegal conduct, but also to other incriminating evidence derived from the primary evidence. *See id.* at 392, 40 S.Ct. 182 ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used *at all.*") (emphasis added). The Court recast this holding in its more enduring form, the "fruit of the poisonous tree" doctrine, in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). There, the Court explained that when examining the admissibility of evidence obtained subsequent to illegal government conduct, courts must examine "whether, granting establishment of the primary illegality" (i.e., the "poisonous tree"), the evidence has been discovered "by exploitation of that illegality" (i.e., the "fruit" of the tree), or instead "by means sufficiently distinguishable to be purged of the primary taint."

*Id.* at 488, 83 S.Ct. 407 (citation omitted). If evidence is found to be the "fruit of the poisonous tree" it must be suppressed. *See id.*

**3.** It has become an interesting question to ask why, exactly, the "fruit of the poisonous tree" doctrine does not operate in the *Miranda* context in the same way it does in the Fourth Amendment context. The distinction was originally premised on the fact that a *Miranda* violation was not a violation of the Constitution, whereas a Fourth Amendment violation was. *Elstad,* 470 U.S. at 305, 105 S.Ct. 1285 ("Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as 'fruit of the poisonous tree' *assumes the existence of a constitutional violation.*" (emphasis added)); *id.* at 306, 105 S.Ct. 1285 ("The *Miranda* exclusionary rule, however, ... sweeps more broadly than the Fifth Amendment itself. *It may be triggered even in the absence of a Fifth Amendment violation.*" (emphasis added)); *id.* at 309, 105 S.Ct. 1285 ("If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should *not* breed the same irremediable consequences *as police in-*

S.Ct. 1285. That is, even though the earlier statement from the suspect was elicited in violation of *Miranda,* so long as the earlier statement was not involuntary due to unconstitutional coercion, the subsequent, voluntary, warned statement was still admissible, without regard to whether it was "tainted" by the earlier statement. *Id.* at 309, 105 S.Ct. 1285 ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances *solely* on whether it is knowingly and voluntarily made." (emphasis added)). Only if the unwarned statement was involuntary due to unconstitutional coercion could the warned statement be suppressed as "tainted fruit." *Id.* at 310, 105 S.Ct. 1285 ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.").

Shortly after *Elstad* was decided, we confirmed that this was the correct understanding of that case:

> The Supreme Court found the prior statement by Elstad to have been voluntary, not coerced, even though technically obtained in violation of the prophylactic rule of *Miranda.* Thus, the Supreme Court reasoned that since there had been no actual coercion such as to violate the [F]ifth [A]mendment, the focus of the inquiry concerning the admissibility of the subsequent statement after the *Miranda* warning should be on whether the subsequent statement was made vol-

untarily rather than on the "taint" analysis required by [*Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)].

\*    \*    \*

Under the Supreme Court's analysis in *Elstad,* in determining the admissibility of a defendant's statement given after the *Miranda* warning, the court should look first to determine whether the statement made by a defendant before the *Miranda* warning was actually coerced in violation of the [F]ifth [A]mendment. If it was, then the court must suppress the evidence unless the violation was sufficiently attenuated to permit the use of the evidence under the standards announced in *Brown.* If, on the other hand, the prior statement was voluntary in the sense that it was not coerced in violation of the [F]ifth [A]mendment, though obtained in technical violation of the *Miranda* requirements, the court should suppress the statement given after the *Miranda* warning only if the court finds that the subsequent statement was not voluntarily made.

*United States v. Wauneka,* 770 F.2d 1434, 1439–40 (9th Cir.1985); *accord United States v. Wauneka,* 842 F.2d 1083, 1086–87 (9th Cir.1988).

B

Nonetheless, Orso argues that this understanding of *Elstad* is incorrect. She argues that *Elstad* should be read to permit us to subject her warned confession to the "tainted fruit" analysis not only if her

---

*fringement of the Fifth Amendment itself."* (emphasis added)). This premise would appear to have been undermined by *Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("[W]e conclude that *Miranda* announced a constitutional rule...."). Nonetheless, *Dickerson* seems

to signal that the distinction set forth in *Elstad* continues unabated. *Id.* at 441, 120 S.Ct. 2326 ("Our decision in [*Elstad*] ... simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment.").

unwarned statements were rendered involuntary due to unconstitutional coercion, but also if they were elicited by police activity called "improper tactics." In support of this theory, Orso makes three contentions. First, she relies on one sentence from *Elstad:* "We must conclude that, absent deliberately coercive *or improper tactics* in obtaining the initial statement, the mere fact that a suspect has made an *unwarned* admission does not warrant a presumption of compulsion." 470 U.S. at 314, 105 S.Ct. 1285 (emphasis added). Second, she argues that triggering the "tainted fruit" analysis on the basis of "improper tactics" furthers one of the policies cited in *Elstad:* deterrence of improper police conduct. *Id.* at 308, 105 S.Ct. 1285. Finally, she relies on our decision in *Pope v. Zenon,* 69 F.3d 1018 (9th Cir.1995), wherein we held that the police "tactic" of "pre-[*Miranda*] interrogation" was "precisely what the Supreme Court had in mind in [*Elstad*] when it exempted 'deliberately coercive or improper tactics in obtaining the initial statement' from the ordinary rule that subsequent statements are not to be measured by a 'tainted fruit' standard, but by whether they are voluntary." *Id.* at 1024 (quoting *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285). We confront each of Orso's arguments in turn.

1

It is true that the one sentence from *Elstad* cited by Orso creates some ambiguity regarding the proper formulation of the rule the Supreme Court wanted us to apply: If the Supreme Court wished to trigger the "tainted fruit" analysis only upon unconstitutionally coerced unwarned statements, then there would have been no reason for the Court to use a disjunctive sentence to include an additional trigger based on a category of behavior called "improper tactics." In context, however, we are persuaded that the Court simply

wished to point out that it is often improper police tactics which render a confession involuntary.

First, the overriding theme running through the Court's opinion is the voluntariness of the unwarned statement. *See Elstad,* 470 U.S. at 310–11, 105 S.Ct. 1285 ("In these circumstances [where an unwarned statement is clearly voluntary], a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible."); *id.* at 312, 105 S.Ct. 1285 ("When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder."); *id.* at 314, 105 S.Ct. 1285 ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."); *id.* at 318, 105 S.Ct. 1285 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made."). The sentence cited by Orso should be read in light of this overriding context, not divorced from it.

Second, there are three other passages in *Elstad* in which the Supreme Court used similar disjunctive language, and each time the Court went on to clarify that it was referring only to police conduct that rendered a confession involuntary. *See Elstad,* 470 U.S. at 309, 105 S.Ct. 1285 ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion *or other circumstances calculated*

*to undermine the suspect's ability to exercise his free will,* so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.") (emphasis added); *id.* at 312, 105 S.Ct. 1285 ("There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence *or other deliberate means calculated to break the suspect's will* and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case.") (emphasis added); *id.* at 317, 105 S.Ct. 1285 ("[N]or do we condone inherently coercive police tactics *or methods offensive to due process that render the initial admission involuntary* and undermine the suspect's will to invoke his rights once they are read to him.") (emphasis added). In light of the Supreme Court's other uses of similarly disjunctive language, we think the most persuasive reading of the "improper tactics" passage is that the Court simply meant to connect such police conduct to the potential involuntariness of the unwarned statements.

Finally, we note that the only other circuit to have considered the precise question presented here is in full accord with our reading of *Elstad:*

> This argument focuses on some admittedly imprecise language in *Elstad* while ignoring the Court's emphasis on voluntariness throughout the opinion. Although the Court did not explicitly define "deliberately coercive or improper tactics," it used several more detailed phrases that in context are synonymous with that term: "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," *id.* at 309, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222; "physical violence or other deliberate means calculated to break the suspect's will," *id.* at

312, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222; and "inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him," *id.* at 317, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. Contrary to Esquilin's argument that there are "improper tactics" that can raise a presumption of compulsion without regard to voluntariness, the *Elstad* Court held that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318, 105 S.Ct. 1285, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. If we read *Elstad* as a coherent whole, it follows that "deliberately coercive or improper tactics" are not two distinct categories, as Esquilin would have it, but simply alternative descriptions of the type of police conduct that may render a suspect's initial, unwarned statement involuntary.

*United States v. Esquilin,* 208 F.3d 315, 320 (1st Cir.2000).

### 2

Orso's second argument likewise fails. It is true that the Court in *Elstad* cited "the general goal of deterring improper police conduct" as one of the policies it considered when formulating its rule. 470 U.S. at 308, 105 S.Ct. 1285 (*citing Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). Nevertheless, the Court *rejected* the notion that deterrence would be better served by expanding the reach of the "tainted fruit" analysis beyond involuntary statements. After noting that *Tucker* rejected the argument that the "general goal of deterring improper police conduct" required the suppression of evidence derived from a *Miranda* violation,

the Court stated: "We believe that this reasoning applies with equal force when the alleged 'fruit' of a *noncoercive Miranda* violation is ... the accused's own voluntary testimony." *Id.* at 308, 105 S.Ct. 1285 (emphasis added).

In light of this and other language in *Elstad*, we fail to understand how Orso could possibly read that opinion to support her proposition that we should suppress her warned confession because doing so will further the goal of deterring noncoercive "improper tactics" on the part of the police. Indeed, her argument was explicitly rejected by the Court in *Elstad:* "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309, 105 S.Ct. 1285. If, instead, Orso's argument is that we should suppress her warned confession because it will serve to deter the police from using the "improper tactic" of interrogating suspects before reading them the *Miranda* warnings in the hope that the psychological effects of "letting the cat out of the bag" will cause them later to waive their *Miranda* rights, then her argument was, again, explicitly rejected by the Court in *Elstad. Id.* at 311–12, 105 S.Ct. 1285.

If, finally, her argument is that we should suppress her warned confession because it will serve to deter the police from using the "improper tactic" of lying during an unwarned interrogation, then it is hard to believe that *Elstad* stands for such a proposition. The Court listed several examples of "situations [unlike] the case at bar" which might have tainted a subsequent, warned confession. *Id.* at 312 n. 3,

105 S.Ct. 1285. None of these many examples, however, described the tactic of lying to a suspect. Rather, they all described "an initial unwarned statement obtained through overtly or inherently coercive methods which raise serious Fifth Amendment and due process concerns." *Id.*

In short, we do not read the language in *Elstad* regarding deterrence of improper police conduct as broadly as Orso would; rather, we read *Elstad* to create a bright-line rule which focuses only on voluntariness: "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.* at 312, 105 S.Ct. 1285.

### 3

■ Finally, Orso's reliance on *Pope*, while justified, will be short-lived. In *Pope*, the police confronted the defendant with truthful information about the evidence against him prior to reading him the *Miranda* warnings, and he responded by making incriminating statements linking himself to the crime. 69 F.3d at 1021, 69 F.3d 1018. After Pope made these statements, the police read him the *Miranda* warnings, and he then gave a detailed confession. *Id.* at 1021–22. Without any consideration of whether Pope's unwarned statements were involuntary, we held that the police "tactic" of "pre-[*Miranda* ] interrogation" was "precisely what the Supreme Court had in mind in [*Elstad* ] when it exempted 'deliberately coercive or improper tactics in obtaining the initial statement' from the ordinary rule that subsequent statements are not to be measured by a 'tainted fruit' standard, but by whether they are voluntary." *Id.* at 1023–24. As we stated at great length above, a proper reading of *Elstad* requires suppression of a warned confession only if it was

tainted by unwarned statements that were *involuntary*. To the extent *Pope* implicitly held otherwise, it is hereby overruled.

### C

Orso's warned confession should therefore be suppressed only if her statements in the car were involuntary, and any taint therefrom had not dissipated by the time Orso was read the *Miranda* warnings.[4] As we explain below, Orso cannot make the first showing.

■ We determine whether Orso's statements in the car were voluntary in light of "the totality of circumstances." *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir.1986). Although Orso testified that her subjective mental state at that time rendered anything she said involuntary, the district court found her testimony not credible—a finding which is not clearly erroneous. In any event, "[a] defendant's mental state alone does not make a statement involuntary." *United States v. Turner*, 926 F.2d 883, 888 (9th Cir.1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 169–71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Rather, "[c]oercive conduct by police must have caused [her] to make the statements." *Id.* at 888. Orso cannot show that her statements in the car were elicited by any coercive conduct on the part of the inspectors.

■ Orso first asserts that Inspector Galetti psychologically coerced her into making involuntary admissions by simply informing her of the evidence against her. However, "this circuit has suggested that when an officer informs a defendant of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody." *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (holding that officer's explanation of the evidence against defendant which led to his arrest was attendant to custody). Inspector Galetti's act of confronting Orso with evidence of her guilt was not coercive.

■ Orso next argues that Inspector Galetti engaged in coercive conduct by misrepresenting a piece of the evidence against her when he falsely stated that a witness thought Orso had used a gun in commission of the robbery. While reprehensible, this use of deception, however, does not constitute coercive conduct. *Frazier v. Cupp*, 394 U.S. 731, 737–739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that confession was voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to the crime).

Orso also contends that Inspector Galetti coerced her when he outlined the statutory penalties for armed and unarmed robbery. However, the information provided by Inspector Galetti was accurate, and its recitation does not constitute coercive conduct. *United States v. Bautista–Avila*, 6 F.3d 1360, 1365 (9th Cir.1993) (" '[R]ecitation of the potential sentence a defendant might receive' does not render a statement involuntary.").

■ Orso also maintains that the physical circumstances surrounding her admissions were coercive because she was handcuffed, seated next to Inspector Tiller, and transported in the back of a government vehicle. However, the car ride lasted no more than thirty-five minutes, and the discussion of her involvement in the crime lasted no more than twenty minutes. Such circumstances do not evince coercion. *Pinion*, 800 F.2d at 981 (holding that custodial interrogation lasting over one hour did not render confession involuntary). Indeed, if transporting a handcuffed sus-

---

4. Orso does not argue that her confession at the office was involuntary.

pect in the back seat of a patrol car constituted coercion, virtually every arrest in this Circuit would be in violation of the Constitution.

■ Finally, Orso claims that Inspector Galetti engaged in coercive conduct by exploiting her fear of being separated from her two-year old daughter for a prolonged period of time. The facts found by the district court, however, demonstrate that Inspector Galetti did not prey upon Orso's subjective fears. According to Orso's own testimony, it was not until *after* Orso made all of her statements in the car that the subject of her daughter first came up, and it was broached by Orso herself. Although Orso testified that the inspectors threatened to keep her from her daughter if she did not cooperate, the inspectors deny this, and the district court found her testimony not credible—a finding which is not clearly erroneous. Orso's situation was therefore a far cry from the case on which she relies, *United States v. Tingle*, 658 F.2d 1332, 1335–37 (9th Cir.1981) (holding that police conduct was coercive where the officers threatened the suspect with long-term separation from her child if she failed to cooperate). Accordingly, we reject Orso's argument that she was coerced by threats of reprisal regarding her daughter.

■ We conclude that, under the totality of these circumstances, the inspectors' conduct did not render Orso's statements in the car involuntary. We therefore agree with the district court that, under *Elstad*, Orso's Mirandized confession should not have been suppressed.

## IV

For the foregoing reasons, we reverse the district court's denial of Orso's motion to suppress her statements in the car, but we affirm the district court's denial of her motion to suppress her full confession. Accordingly, because Orso prevailed, in part, in this appeal from her conditional guilty plea, we vacate Orso's conviction and remand to the district court to permit Orso to withdraw her guilty plea, if she so chooses, and proceed to trial. Fed. R.Crim.P. 11(a)(2).

AFFIRMED in part, REVERSED in part, and REMANDED.

PAEZ, Circuit Judge, with whom Chief Judge SCHROEDER and Circuit Judges HAWKINS, McKEOWN, and RAWLINSON join, concurring:

I concur in the determination that the district court must suppress the incriminating statements Orso made after two U.S. Postal Inspectors arrested and took her into custody and then drove her in their government vehicle from the Redondo Beach Police Department to the Postal Inspection Service Office. The Postal Inspectors interrogated Orso without first informing her of her Constitutional rights, and these "unwarned" statements must therefore be suppressed. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

With some reluctance, I also concur in the conclusion that, under *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the district court need not suppress the confession Orso made after she was read, and then waived, her *Miranda* rights. I write separately for two reasons. First, the court's opinion does not accord due weight to the Inspectors' admission that they deliberately failed to advise Orso of her Constitutional rights because they believed that, unwarned, she would unwittingly incriminate herself. Second, the court identifies the particular conduct that Orso contends was coercive, but does not consider all the factors in their totality, as the Supreme Court

requires and as the Inspectors' subtle coercion demands.

## I

The Fifth Amendment guarantees a person's right to remain silent "unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (holding the Fifth Amendment applicable to the states through the Fourteenth Amendment). The Supreme Court acknowledged in *Miranda* that "inherently compelling pressures" in the process of in-custody interrogation of persons suspected or accused of crimes "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. 1602. As we have explained, the Court ordered that an accused be advised of his rights before custodial interrogations begin "to ensure [he] is both aware of his substantive Constitutional right to silence, as well as his continuous opportunity to exercise that right." *Cooper v. Dupnik*, 963 F.2d 1220, 1239 (9th Cir.1992) (en banc) ("It is no accident that the first words out of a police officer's mouth during a *Miranda* advisement must be: You have a 'right to remain silent.' ").

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him....' " *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).[1] Society abhors the use of involuntary confessions because they are inherently untrustworthy and because we share

"the deep-rooted feeling that the police must obey the law while enforcing the law[.]" *Spano v. New York*, 360 U.S. 315, 320–21, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Miranda*, 384 U.S. at 480, 86 S.Ct. 1602 ("The quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law.") (quoting Walter V. Schaefer, "Federalism and State Criminal Procedure," 70 HARV. L. REV. 1, 26 (1956)).

The roots of our recognition and protection of the fundamental right not to be compelled to testify against oneself run deep. More than a century ago, the Supreme Court observed in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), that under English law dating back to 1655, courts knew that the very process of giving a statement to an official might "impel [a prisoner] involuntarily to speak" unless he was cautioned that the statement was optional. The cautionary advisement was so important, in fact, that the precise wording of the warning was codified by statute. 168 U.S. at 550, 18 S.Ct. 183 ("You are not obliged to say anything unless you desire to do so, but whatever you say will be taken down in writing, and may be given in evidence against you upon your trial.").

To be voluntary, a confession must be "the product of a rational intellect and a free will." *Blackburn v. State of Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). In addition to the pressures inherent in custodial interrogation, other factors can compromise the free will of an accused. Officials cannot extract a confession "by any sort of threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram*, 168 U.S. at

---

1. Although Orso's incriminating unwarned statements were not a full confession, the analysis of their voluntariness remains the same.

542–43, 18 S.Ct. 183, *quoted in Malloy*, 378 U.S. at 7, 84 S.Ct. 1489. Courts do not require physical injury before finding an interrogation unconstitutional. "[M]ore sophisticated modes of 'persuasion'" may suffice. *Blackburn*, 361 U.S. at 206, 80 S.Ct. 274. Neither physical intimidation nor psychological pressure is permissible. *U.S. v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.1981) (citation omitted) (subtle psychological coercion suffices at times more effectively "to overbear a rational intellect and a free will") (quoting *Blackburn*, 361 U.S. at 208, 80 S.Ct. 274); *see also Blackburn*, 361 U.S. at 206, 80 S.Ct. 274 ("A prolonged interrogation of an accused *who is ignorant of his rights* and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror.") (emphasis added); *Cooper*, 963 F.2d at 1247 ("pressuring a suspect to talk can be impermissibly coercive, even if no physical brutality is used.").

In assessing the voluntariness of a confession, we examine police conduct to determine whether it was coercive. Fortunately, we rarely encounter the types of police misconduct that gave rise to *Miranda*. Nonetheless, "as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made." *Spano*, 360 U.S. at 321, 79 S.Ct. 1202, *quoted in Cooper*, 963 F.2d at 1245.

We take a dim view of deliberate, in contrast to inadvertent or "technical," failures to advise an accused of his Constitutional rights. *See, e.g., Henry v. Kernan*, 197 F.3d 1021, 1029 (9th Cir.1999) (although a post-*Miranda* voluntary statement can be used for impeachment purposes, where the sheriff's officers "set out

in a deliberate course of action to violate *Miranda* [,] ... the State should not be permitted to use [these] statements[.]"). The focus remains on coercion, and where the failure to comply with *Miranda* is coercive in intent and effect, this conduct cannot be ignored. "For victims caught in the[ ] snare" of "officials who deliberately choose to ignore the law and the Constitution in favor of their own methods ... the Constitution of the United States becomes a useless piece of paper." *Cooper*, 963 F.2d at 1252.

The Supreme Court has recognized repeatedly that our inquiry does not become less rigorous merely because physical coercion has yielded to far more sophisticated methods. To the contrary, the Court has directed that our decisions reflect "a careful scrutiny of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, when considering whether the degree of coercion involved in a deliberate, calculated decision to violate *Miranda* deprives an individual of due process under the Fifth Amendment, we pay close attention to the subtleties of interrogation techniques.

One relevant factor we examine is whether and when the police administer the *Miranda* warnings. *See Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041 ("lack of any advice to the accused of his constitutional rights" is factor in determining voluntariness); *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("Before petitioner made any incriminating statements, he received partial warnings of his constitutional rights[,] ... a circumstance quite relevant to a finding of voluntariness."); *Davis v. State of North Carolina*, 384 U.S. 737, 740–41, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (whether defendant received warnings at outset of interrogation is "significant factor" and "gives add-

ed weight" to circumstances which made confessions involuntary.); *United States v. Wauneka*, 770 F.2d 1434, 1440–41 (9th Cir. 1985) ("whether Wauneka was advised that his prior admission could not be used against him; or whether . . . Wauneka was told that his previous remarks could be used against him" are factors in determining voluntariness of confession).

The timing of the *Miranda* advisement can be critical. As Justice Brennan explained in his dissent in *Elstad*, "expert interrogators" aim for the all-important "first admission": "such revelations frequently lead directly to a full confession. Standard interrogation manuals advise that . . . 'there is every reason to expect that the first admission will lead to others, and eventually to a full confession.'" 470 U.S. at 328, 105 S.Ct. 1285 (internal citation omitted). He added that "[i]nterrogators describe the point of the first admission as the 'breakthrough' and the 'beachhead,' . . . which once obtained will give them enormous 'tactical advantages[.]'" *Id.* (internal citations omitted). As a result, withholding *Miranda* warnings until the end of an interrogation session is not a novel strategy. At that late point in the interrogation, *Miranda* warnings may have less impact:

> There are numerous variations on this theme. Police may obtain a confession in violation of *Miranda* and then take a break for lunch or go home for the evening. When questioning is resumed, this time preceded by *Miranda* warnings, the suspect is asked to "clarify" the earlier illegal confession and to provide additional information . . . *Alternatively, the suspect might be questioned by arresting officers "in the field" and without Miranda warnings, as was young Elstad in the instant case. After making incriminating admissions or a confession, the suspect is then brought into the station house and either questioned by the same officers again or asked to repeat his earlier statements to another officer.*

*Id.* at 330–31, 105 S.Ct. 1285 (internal footnotes omitted) (emphasis added). "For all practical purposes, the prewarning and post-warning questioning are often but stages of one overall interrogation." *Id.* at 331, 105 S.Ct. 1285.

In this case, there was nothing accidental about the failure to advise Orso of her rights. Inspector Galetti testified that they had an arrest warrant for Orso and took her into custody. She was placed in handcuffs and seated in the government car—next to Inspector Tiller. Neither Galetti nor Tiller read Orso her rights upon taking her into custody, handcuffing her, or placing her in the vehicle. After some general conversation, *Galetti* initiated discussion of the robbery. Neither Galetti nor Tiller read Orso her rights at this point either. In fact, Galetti admitted that he *meant* to get her talking and that to do so, he said he was just "reviewing the facts of the robbery" with her. Why no *Miranda* warnings? "Well, we wanted to eventually speak with Miss Orso and thought that if we Mirandized her right away that she might not want to speak with us." He stated that he told her not to talk, but his lack of good faith emerges from his candid admission that he intended to prompt her to converse with them.

True, the inspectors did not touch Orso, deprive her of food or water, or even utter a harsh word. But Inspector Galetti's blatant manipulation of the duty to advise a suspect of her Constitutional rights makes a mockery of *Miranda* and the rights the case was intended to protect. The fact that Inspector Galetti adeptly maneuvered around the requirements of *Miranda* should not obscure the fact that in doing so, he deprived Orso of information that

was indispensable to her exercise of free will. "To be sure, this is not physical intimidation, but it is equally destructive of human dignity." *Miranda,* 384 U.S. at 457, 86 S.Ct. 1602. Pain-free coercion is coercive just the same.

## II

Our jurisprudence regarding confessions "yield[s] no talismanic definition of 'voluntariness,'" so we must determine "the factual circumstances surrounding the confession, assess[ ] the psychological impact on the accused, and evaluate[ ] the legal significance of how the accused reacted." *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041. "[T]he voluntariness of the first [unwarned] confession is evaluated in light of the totality of the circumstances." *United States v. Wauneka,* 842 F.2d 1083, 1087 (9th Cir.1988) (citing *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). No single criterion controls. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041.

The Supreme Court in *Schneckloth* set out several of the factors that bear on our analysis. In the past, for example, the Court had considered "the youth of the accused, ... or his low intelligence, ... *the lack of any advice to the accused of his constitutional rights,* ... the length of detention, ... the repeated and prolonged nature of the questioning, ... and the use of physical punishment such as the deprivation of food or sleep...." 412 U.S. at 226, 93 S.Ct. 2041 (internal citations omitted) (emphasis added).

Today's opinion identifies the relevant factors in the analysis and rejects each factor as a basis *in and of itself* for finding Orso's unwarned statements to be involuntary. The analysis is correct as far as it goes, but a final step remains: considering the factors in their totality. *U.S. v. Wauneka,* 842 F.2d at 1087. In my view,

the Inspectors' tactics are more coercive when the following facts are reviewed together. Notably, Orso was in the Inspectors' custody from the moment they left the Police Department; she was handcuffed; she was placed in the back of a government vehicle; Inspector Tiller sat next to her; these procedures were followed, Inspector Galetti testified, because Orso was a "prisoner;" Inspectors Galetti and Tiller deliberately failed to advise Orso of her Constitutional rights at any point during the drive to the Postal Inspection Service Office because they believed she would exercise her right to remain silent if they did so; knowing that no witness saw her use a gun, Galetti nevertheless lied to Orso about this fact; and knowing that there was no evidence that she had used a gun, Galetti nevertheless told her that she potentially faced a 25–year sentence (for armed robbery).

Although other factors (relatively brief period of detention, adult suspect, suspect's awareness prior to being taken into custody of investigation into the robbery) appear to have lessened the coercive impact on *this* defendant of the Inspectors' "end run" around *Miranda,* neither the letter nor the spirit of *Miranda* fare well today. The official conduct here did not consist of "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise [her] free will." *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. I concur, however, because I cannot say that, under existing Supreme Court precedent, the Inspectors' conduct was *so* coercive that Orso lacked sufficient free will to decide whether to waive her right to remain silent.