The Mobile County grand jury returned two separate indictments (case no. CC-00-3419 and case no. CC-00-3420) against the appellant, Brent David Kabat, on November 14, 2000, charging him with murder made capital because it was committed during a first-degree robbery (case no. CC-00-3419), a violation of § 13A-5-40(a)(2), Ala. Code 1975, and murder made capital because it was committed during a first-degree kidnapping (case no. CC-00-3420), a violation of § 13A-5-40(a)(1). After the trial court denied his application for treatment as a youthful offender pursuant to §§ 15-19-1 through 15-19-7, Ala. Code 1975, the appellant waived arraignment and entered pleas of not guilty. The indictments were consolidated for trial, and on December 14, 2001, a jury found him guilty as charged in both indictments. After a sentencing hearing before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975, the jury recommended sentences of life imprisonment without the possibility of parole. After another sentencing hearing before the trial court on February 1, 2002, in accordance with §§ 13A-5-49 through -52, the trial court accepted the jury's recommendations and sentenced the appellant to life imprisonment without the possibility of parole in each case. The appellant appeals, raising two issues.
The State's evidence tended to show the following. The appellant and an accomplice, Jeremy Shawn Bentley,[1] abducted Jamie Tolbert at some point after they had gotten into Tolbert's vehicle with him in a nightclub parking lot in Biloxi, Mississippi, in the early morning hours of January 1, 2000. They transported him in his automobile to a rural area of Mobile County, Alabama, where they strangled and beat him to death and dumped his body in a wooded area a short distance from a secondary road; they took Tolbert's billfold, his money, his credit cards, and his automobile and returned to their home state of North Carolina. They used Tolbert's bank credit card several times in North Carolina and traveled across the United States to California, leaving a trail by their frequent use of Tolbert's bank credit card. They were arrested by the California Highway Patrol on January 15, 2000, while driving Tolbert's vehicle. When they were arrested, they were in possession of Tolbert's bank credit card and were heavily armed.
The appellant did not testify and called only one witness, a jailer, in an apparently unsuccessful effort to cast doubt upon testimony of an inmate who had testified for the State that the appellant had told him that he and another person had killed Tolbert.
 I.
The appellant first contends that the trial court committed reversible error *Page 1155 
by denying his motion to suppress the evidence derived from his allegedly unlawfully obtained inculpatory statements.
Shortly after the appellant and Bentley were apprehended in California, Investigator Dale Kohn of the Mobile County Sheriff's Department went to California to question them regarding the whereabouts of Tolbert, who at that time, was considered only as missing. Kohn questioned the appellant first, beginning at 12:01 p.m. and ending at 1:00 p.m. on June 16, 2000. The appellant gave him a detailed oral statement, telling how he and Bentley kidnapped, robbed, and murdered Tolbert and disposed of his body. He described in general terms the area where Tolbert's body could be found. Kohn immediately called the Mobile investigators and gave them the information that the appellant had furnished. After some difficulty, the investigators found Tolbert's body. The next day, Kohn obtained a recorded statement from the appellant, which was substantially the same as his oral statement.
Two hours after first questioning the appellant, Kohn questioned Bentley. Bentley's account of how he and the appellant had committed the offenses was similar to the appellant's. However, he gave a more detailed and accurate account of the location of the body and the crime scene. He, unlike the appellant, had been in the area before and was familiar with it.
At a pretrial hearing, the trial court ruled that the appellant's statements were to be suppressed at trial. It appears from the record that the trial court found them to have been involuntarily induced by promises and threats by Kohn during the interrogations. The appellant subsequently moved the trial court to suppress the evidence of Tolbert's body and all evidence relating to it because, he argued, that evidence was discovered as a result of his first illegally obtained statement and should be excluded from use at trial pursuant to the "fruit of the poisonous tree" doctrine, citing Nix v. Williams, 467 U.S. 431 (1984). After an evidentiary hearing, the trial court denied the motion without comment. The evidence of the body and all related evidence, including evidence of the crime scene, was admitted into evidence at the trial.
 "`The exclusionary rule requires that evidence obtained directly or indirectly through government violations of the Fourth, Fifth, or Sixth Amendments may not be introduced by the prosecution at trial, at least for the purpose of providing direct proof of the defendant's guilt. When a court improperly admits evidence in violation of the exclusionary rule, reversal is required unless the error was harmless beyond a reasonable doubt.'
 "Miles Clark, Project, Thirty-first Annual Review of Criminal Procedure, The Exclusionary Rule, 90 Geo. L.J. 1087, 1264 (2002) (footnotes omitted).
 "`As an adjunct of the exclusionary rule, the "fruit of the poisonous tree" doctrine holds that the use of derivative evidence can be barred if the evidence is discovered by the exploitation of a prior police illegality, if the primary taint has not been purged by some intervening act or event.'
 "1 John Wesley Hall, Jr., Search and Seizure § 7.1 (3d ed. 2000).
 "`The roots of the doctrine requiring courts to suppress evidence as the tainted "fruit" of unlawful governmental conduct can be traced to Silverthorne Lumber Co. v. United States, 251 U.S. 385 . . . (1920). In that case, the Supreme Court extended the exclusionary rule to apply not only to evidence obtained as a result of illegal *Page 1156 
conduct, but also to other incriminating evidence derived from the primary evidence. See id. at 392 . . . ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") (emphasis added). The Court recast this holding in its more enduring form, the "fruit of the poisonous tree" doctrine, in Wong Sun v. United States, 371 U.S. 471 . . . (1963). There, the Court explained that when examining the admissibility of evidence obtained subsequent to illegal government conduct, courts must examine "whether, granting establishment of the primary illegality" (i.e., the "poisonous tree"), the evidence has been discovered "by exploitation of that illegality" (i.e., the "fruit" of the tree), or instead "by means sufficiently distinguishable to be purged of the primary taint." Id. at 488 . . . (citation omitted). If evidence is found to be the "fruit of the poisonous tree" it must be suppressed. See id.'
"United States v. Orso, 266 F.3d 1030, 1034 n. 2 (9th Cir. 2001), cert.denied, 537 U.S. 828, 123 S.Ct. 125 (2002).
 "`The exclusionary rule is not a personal constitutional right, but rather a judicially created remedy to deter government violations of the Constitution. Because the goal of deterrence will not always be advanced by excluding relevant, though illegally obtained, evidence, the Supreme Court has identified several exceptions to the exclusionary rule. . . .'
"Clark, supra, 90 Geo. L.J. at 1264 (footnotes omitted)." Foldi v.State, [Ms. CR-01-0554, Nov. 22, 2002] 861 So.2d 414, 419-20
(Ala.Crim.App. 2002).
Two exceptions to the exclusionary rule are the independent-source exception and the inevitable-discovery exception.
 "Independent Source Exception. Even if police engage in illegal investigatory activity, evidence will be admissible if it is discovered through a source independent of the illegality. The independent source doctrine reflects the idea that although the government ought not profit from its misconduct, it also should not be made worse off than it would have been had the misconduct not occurred.
 "Inevitable Discovery Exception. The inevitable discovery exception to the exclusionary rule is closely related to the independent source doctrine. Under this exception, a court may admit illegally obtained evidence if the evidence inevitably would have been discovered through independent, lawful means. For example, in Nix v. Williams, [467 U.S. 431
(1984),] the Supreme Court held that evidence concerning the location and condition of a murder victim's body was admissible even though the police obtained this information in violation of the defendant's Sixth Amendment right to counsel. The Court reasoned that a comprehensive search already under way at the time of the police illegality would have inevitably resulted in the discovery of the body."
Miles Clark, Project, Thirty-first Annual Review of Criminal Procedure,The Exclusionary Rule, 90 Geo. L.J. 1264, 1274-76 (2002) (footnotes omitted). See, e.g., Murray v. United States, 487 U.S. 533, 539 (1988) (noting that inevitable discovery is actually an extrapolation from the independent-source doctrine: because the tainted evidence would be admissible if in fact it was discovered through an independent source, it *Page 1157 
should be admissible if it inevitably would have been discovered).
The State contends that the trial court properly denied the appellant's motion to suppress any evidence derived from the appellant's first illegally obtained confession because, it argues, the challenged evidence was admissible under the inevitable-discovery exception to the exclusionary rule. The State also contends, in the alternative, that if we find that the trial court erroneously admitted the derivative evidence, we should find that the error was harmless beyond a reasonable doubt, citing Chapman v. California, 386 U.S. 18 (1967), and Rule 45, Ala.R.App.P.
Under the first exception — the independent-source doctrine — the prosecution must show that the challenged evidence was derived from a lawful source independent of the illegal conduct by the police. UnitedStates v. Terzado-Madruga, 897 F.2d 1099, 1115 (11th Cir. 1990). SeePeoples v. State, 510 So.2d 554, 569 (Ala.Crim.App. 1986), aff'd,510 So.2d 574, 577 (Ala. 1987). Under the inevitable-discovery exception, the prosecutor has the burden of demonstrating (1) that there is a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police, before the misconduct, were actively pursuing the alternative line of investigation. UnitedStated v. Cherry, 759 F.2d 1196 (5th Cir. 1985); United States v.Brookins, 614 F.2d 1037, 1043 (5th Cir. 1980).[2]
After examining the evidence introduced in the suppression hearings, we conclude that the State established the necessary elements of the inevitable-discovery exception to the exclusionary rule. When the initial illegality occurred, i.e., the violation of the appellant's constitutional rights in the taking of his first confession, the police had Bentley in custody for questioning, and there was a reasonable probability that the challenged evidence would have been discovered from the information Bentley disclosed. Kohn went to California to question both the appellant and Bentley about Tolbert's disappearance. Bentley was under arrest and awaiting questioning, while the appellant was being questioned the first time. Perhaps for some undisclosed reason or perhaps by happenstance, Kohn chose to question the appellant first; however, in any event, he intended also to question Bentley. Thus, the alternate avenue of inquiry was, in effect, being pursued before the initial misconduct. The evidence would have inevitably been discovered through questioning Bentley.
Moreover, the alternate avenue of inquiry, i.e., the questioning of Bentley, was truly independent because it did not rely on any information derived from the appellant; it was inevitable that Kohn would have questioned Bentley; and the results of that questioning are a matter of historical fact. Within two hours of *Page 1158 
the appellant's first statement, Bentley independently gave the police more accurate information than the appellant had given them. We find that the evidence was also admissible under the independent-source exception to the exclusionary rule.
Accordingly, regardless of the illegality of the appellant's first statement, we find that the evidence of Tolbert's body and the crime scene and all related evidence were admissible under the inevitable-discovery exception and the independent-source exception to the exclusionary rule. Therefore, we hold that the trial court did not abuse its discretion in denying the appellant's motion to suppress the testimony of the witnesses concerning the discovery of and matters relating to Tolbert's body and the demonstrative evidence related thereto. Although not necessary for our holding, we further note that we agree with the State's assertion that, had the trial court erred in denying the appellant's motion to suppress the derivative evidence, its ruling would have been harmless beyond a reasonable doubt under the facts of this case.
 II.
The appellant contends that the State's evidence was insufficient to support his convictions for the capital offenses charged in the indictments.[3] In his brief, he appears to concede that the State's evidence was sufficient, when viewed in the light most favorable to the prosecution, to establish a prima facie case of murder, but he asserts that the evidence was insufficient to establish a prima facie case that the murder was committed during a robbery or during a kidnapping, §§13A-5-40(a)(2)[4] and (a)(1),[5] respectively. *Page 1159 
In addition to the State's evidence set out supra, the State's evidence also tended to show that the appellant, Bentley, and Tolbert were seen getting into Tolbert's vehicle in the parking lot of a nightclub in Biloxi in the early morning hours of January 1, 2000; that Tolbert, who was dressed in a tuxedo, was to meet some friends at a nearby nightclub, but that he never arrived; and that, 16 days after his disappearance, his body was found in a rural area near Grand Bay, Alabama. The evidence further showed that Tolbert had been beaten and strangled; that, near his head, officers collected four of his teeth, which had apparently been knocked out by a blunt instrument; that, a short distance from his body, the officers saw signs of a struggle in the grass and weeds and found Tolbert's black bow tie; and that they also found an automobile jack handle, which matched the one missing from Tolbert's vehicle, in some bushes near where the body was discovered.
The State's evidence further established that the appellant and Bentley began using Tolbert's bank credit card in North Carolina shortly after the three were last seen in Biloxi; that security cameras in various locations across the United States corroborated this use of the credit card by the appellant and Bentley; that a forensic examination of Tolbert's vehicle, which the appellant and Bentley had driven to California and which was seized when they were arrested in California, revealed human blood on the backseat and on the rear floor mat, and subsequent tests of that blood showed that it was not the appellant's or Bentley's[6]; and that the jack handle was missing from Tolbert's vehicle.
Finally, the State elicited the testimony of Rayford Mitchell, a prisoner in the Mobile County jail, that the appellant, who was also incarcerated in the jail awaiting trial, told him that he and another person killed Tolbert. Mitchell testified, as follows, during direct examination:
 "A. . . . [Kabat] told me that him and . . . another young man went to Mississippi near the gambling boats and picked up a homosexual. They drove him back down to Grand Bay and they killed him and I'm not talking about one of them killed him, both of them killed him.
"Q. . . . Did he tell you anything beyond that?
 "A. Just that . . . they were high on drugs, sir, and they wanted to see how it felt to kill somebody.
". . . .
 "Q. . . . Did you have to ask him about it or did he volunteer it?
 "A. No. He'd talk about it. He'd talk about how crazy his friend was and how they did it. One of them . . . was beating the guy, he couldn't kill him so [Kabat] finished it off. . . ." *Page 1160 
In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, an appellate court must review the evidence in the light most favorable to the prosecution; conflicting evidence presents a jury question not subject to review on appeal, provided the State's evidence established a prima facie case.Williams v. State, 710 So.2d 1276, 1337 (Ala.Crim.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997); Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978). The action of the trial court in denying a motion for a judgment of acquittal or a motion for a new trial must be reviewed by determining whether there existed legal evidence before the jury, at the time the motions were made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Williams v. State, 710 So.2d at 1337; Willis v. State, 447 So.2d 199 (Ala.Crim.App. 1983). When the evidence raised questions of fact for the jury and that evidence, if believed, was sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal or of the alternate prayer for relief in a motion for a new trial on the ground of insufficiency of the evidence does not constitute error. Williams v. State.
A defendant's guilt may be established by circumstantial evidence as well as by direct evidence, and so long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v. State, 470 So.2d 1331
(Ala.Crim.App. 1985). In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." Cumbo v.State, 368 So.2d at 874. See also Ward v. State, 557 So.2d 848, 850
(Ala.Crim.App. 1990).
The appellant, relying on the testimony of the prisoner Mitchell, suggests that the motive for the killing was to experience what it felt like to kill someone and that the taking of Tolbert's property was an afterthought. He relies on Connolly v. State, 500 So.2d 57
(Ala.Crim.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986), which holds that an accused is not guilty of the capital offense of robbery-murder where the intent to rob was formed only after the victim was killed. Before he disappeared, Tolbert was "out on the town" in formal wear, celebrating New Year's Eve, with plans to meet friends at a specific place. While the appellant told Mitchell that he and Bentley had picked up and killed Tolbert, there was no evidence in the record indicating that Tolbert was a homosexual. Rather, there was evidence to the contrary. It is possible that, for some reason, Tolbert voluntarily permitted the appellant and Bentley to enter his automobile in Biloxi, but it is reasonable to conclude from the evidence, especially the evidence of the blood in the backseat of Tolbert's vehicle, that Tolbert did not go voluntarily with them to Grand Bay. The blood on the backseat and floor of Tolbert's automobile, which was undoubtedly his, supports reasonable inferences that at some point he was abducted, injured before he got out or was taken out of the car, carried to the spot where his bloody bow tie was found, beaten and strangled to death, and robbed of his belongings. The appellant's suggestions that this was a "thrill" killing, that the taking of Tolbert's property was an afterthought, and that Tolbert had not been abducted fly in the face of the facts, which strongly suggest otherwise. The evidence against the appellant, albeit largely circumstantial, was strong. *Page 1161 
After applying the above standards of review to the State's evidence, which was both direct and circumstantial, we find that there existed legal evidence before the jury, at the time of the motion for judgments of acquittal at the conclusion of the State's case-in-chief, from which the jury by fair inference, could have excluded every reasonable hypothesis except that of guilt of the capital crimes charged. Thus, the charges were properly submitted to the jury.
The appellant also challenges the weight of the evidence supporting his convictions. We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial and that the credibility of witnesses and the weight and probative force of testimony are for the jury to judge and determine. Williams v. State, 710 So.2d at 1338.
Accordingly, we hold that the trial court did not abuse its discretion in denying the appellant's motions for judgments of acquittal and the alternative prayer for relief within his motion for a new trial.
For the above reasons, the judgments of the trial court are affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, SHAW, and WISE, JJ., concur.
[1] On November 7, 2002, Jeremy Shawn Bentley was convicted of the same two capital-murder offenses and was sentenced, for each conviction, to life imprisonment without the possibility of parole. He has appealed those convictions to this court (case no. CR-02-0263), but the complete transcript has yet to be filed with this court.
[2] The Federal Circuit Courts of Appeals are divided as to whether the inevitable-discovery exception requires a showing that the police were actively pursuing an alternative method of investigation at the time the constitutional violation occurred. Clark, The Exclusionary Rule, 90 Geo. L.J. at 1276 n. 622. The rule in the Court of Appeals for the Eleventh Circuit is that, "to establish inevitable discovery the prosecution must show that the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred." United States v.Khoury, 901 F.2d 948, 960 (11th Cir. 1990). See also United States v.Drosten, 819 F.2d 1067, 1069 (11th Cir. 1987); United States v.Satterfield, 743 F.2d 827, 847 (11th Cir. 1984).
[3] The appellant preserved this issue for review by motions for judgments of acquittal, which were made at the conclusion of the State's case-in-chief and at the conclusion of the presentation of all of the evidence, and as an alternative prayer for relief within his motion for a new trial.
[4] "To sustain a conviction under § 13A-5-40(a)(2), the State must prove beyond reasonable doubt (1) a `robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41; (2) a murder as defined by § 13A-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in the immediate flight from the commission of' the robbery or attempted robbery in the first degree. § 13A-5-39(2); Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988), affirmed, 548 So.2d 547 (Ala.), cert. denied,493 U.S. 945 . . . (1989). The intentional killing must take place during the course of the robbery in question; however, the taking of the property of the victim need not occur before the killing. Hallford. . . . The fact that the murder victim was dead when the property was taken would not prevent a finding of robbery, if the murder and the taking of property formed a continuous chain of logically related events. Hallford. The question whether the defendant had the intent to kill at the time of the taking is usually a jury issue, and the jury may infer from the facts and circumstances that a robbery began when the accused attacked the victim and that the capital offense was consummated when the accused took the robbery victim's property and fled. Hallford." Ex parte Johnson,620 So.2d 709, 713-14 (Ala. 1993).
[5] "[T]o support a capital conviction under § 13A-5-40(a)(1), Ala. Code 1975, the state must prove that an intentional murder occurred during a kidnapping, as defined in § 13A-6-43(a), Ala. Code 1975.
 "In order to prove kidnapping in the first degree, we have held as follows:
 "`[T]he State must prove two intents: The first deriving from the abduction element and the second from the statutory subdivisions of § 13A-6-43(a)(1)-(6) [i.e., in this case, intent to accomplish or aid the commission of first-degree robbery or flight therefrom, § 13A-6-43(a)(3)]. The abduction element of kidnapping in the first degree is defined at § 13A-6-40(2), [Ala. Code 1975], as follows:
 "`"(2) Abduct. To restrain a person with intent to prevent his liberation by either:
 "`"(a) Secreting or holding him in a place where he is not likely to be found, or
"`"(b) Using or threatening to use deadly physical force."
"`. . . .
 "`Proof of intent, necessary to convict under § 13A-6-43, "must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction." Doss v. State, 23 Ala. App. 168, 180, 123 So. 237, 248 (1929). . . .'
"Owens v. State, 531 So.2d 2, 13-14 (Ala.Cr.App. 1986)."
Broadnax v. State, 825 So.2d 134, 203 (Ala.Crim.App. 2000), aff'd,825 So.2d 233 (Ala. 2001).
[6] Because of the advanced decomposition of Tolbert's body, the forensic examiners were not able to obtain a blood sample for a comparison with the blood from Tolbert's vehicle, and they did not pursue a DNA analysis.