**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jody Myesha ORSO, Defendant– Appellant.**

**No. 99–50328.**

**D.C. No. CR-98-00024-LGB-01**

United States Court of Appeals, Ninth Circuit.

Filed Dec. 28, 2001.

Before: SCHROEDER, Chief Judge, and HUG, KOZINSKI, O'SCANNLAIN, KLEINFELD, HAWKINS, McKEOWN, GOULD, PAEZ, TALLMAN, and RAWLINSON, Circuit Judges.

Order; Concurrence by Judge O'SCANNLAIN; Dissent by Judge TROTT

## ORDER

A sua sponte call for full court en banc rehearing was made by a member of the Court. The full court was advised of the call. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of full court en banc reconsideration. *See* Fed. R.App. P. 35; Ninth Cir. R. 35–3.

The sua sponte call for full court en banc rehearing is, accordingly, REJECTED.

O'SCANNLAIN, Circuit Judge, with whom Circuit Judges KOZINSKI, KLEINFELD, and GOULD join, specially concurring in the denial of full court en banc rehearing:

Judge Trott's impassioned dissent from our denial of full court en banc rehearing in this case makes clear that he disapproves of the methods that the police employed which produced Jody Orso's Mirandized confession in this case. His views are perfectly reasonable. And who knows—if this court were free to rewrite Fifth Amendment law I might well agree with him. But we are not free to rewrite the law. And that is where I part company with Judge Trott and his merry band of dissenters.[1]

To begin, let us remember that this court does not sit as a kind of super-

---

1. It is telling that not even a single member of our limited en banc court thought that we could ignore controlling Supreme Court precedent; even those joining in the concurrence recognized that *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) controls. *See United States v. Orso*, 266 F.3d 1030, 1040 (9th Cir.2001) (en banc) (Paez, J., concurring) ("With some reluctance, I … concur in the conclusion that, under [*Oregon v. Elstad*], the district court need not suppress the confession Orso made after she was read, then waived, her *Miranda* rights."). Thus, at least on its face, the limited en banc decision

Citizens' Police Review Board, creating some set of federal common-law police regulations for local law enforcement officers in this circuit by distinguishing, on a case-by-case basis, "good" police conduct from "bad." Instead, our only proper role in this context is to determine whether police conduct has in some way rendered the admission of evidence at a criminal trial violative of a defendant's constitutional rights. In short, not everything that this court might consider "bad" (or "improper") is accordingly unconstitutional. *Cf. Pittsley v. Warish,* 927 F.2d 3, 7 (1st Cir.1991) (recognizing that even though "state officials may have misused their authority," and that the court "certainly [did] not condone the acts of the police in this instance," "[t]he plaintiffs, however, have not established a violation of any constitutionally recognized right").

Turning to the constitutional issue we review in this case, I respectfully suggest that, to the extent that Judge Trott is concerned that a *Miranda* violation does not require a "fruit-of-the-poisonous-tree" analysis when it leads to a second, voluntary, warned confession, his quarrel is not with *Orso,* but with the Supreme Court's decision in *Elstad.* In *Elstad,* the Court held that it simply does not matter that a statement is procured because an earlier statement was elicited from a suspect in violation of *Miranda.* So long as the earlier statement was not involuntary due to unconstitutional coercion, the subsequent, voluntary, warned statement is still admis-sible—without regard to whether the subsequent statement was "tainted" by the earlier statement. *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. True, *Elstad*'s rationale relied heavily on the fact that, when *Elstad* was decided, *Miranda* was not understood to be a constitutional rule. *Id.* at 305, 105 S.Ct. 1285("Respondent's contention that his confession was tainted by the earlier failure of the police to provide *Miranda* warnings and must be excluded as 'fruit of the poisonous tree' assumes the existence of a constitutional violation"). And true, the Court's recent decision in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), calls this premise into question. *See id.* at 444, 120 S.Ct. 2326("[W]e conclude that *Miranda* announced a constitutional rule...."). I can therefore understand Judge Trott's desire to take this opportunity to tease out of *Elstad* an entirely new category of police activity, "improper tactics," that gives rise to a fruit-of-the-poisonous-tree analysis.[2] Indeed, he was disposed to do so long before *Dickerson. See Pope v. Zenon,* 69 F.3d 1018, 1024 (9th Cir.1996) (Trott, J.) (hypothesizing that "the tactic of using pre-advice interrogation to open up a suspect" is "precisely what the Supreme Court had in mind in [*Elstad* ] when it exempted 'deliberately coercive *or improper tactics* in obtaining the initial statement' from the ordinary rule that subsequent statements are not to be measured by a 'tainted fruit' standard, but by wheth-

---

reflects an 11–0 vote on the merits. (It may no longer, in fact, reflect an 11–0 vote, given that Judge Hawkins, who joined Judge Paez's concurrence, has subsequently joined in Judge Trott's dissent from denial of full court en banc rehearing.)

**2.** It seems that, at least for now, Judge Trott is content to give content to his newfound category by defining it as "wittingly and purposefully" asking questions before giving *Miranda* warnings. *See infra,* Dissent from De-nial at 17408. Fine for today, but why stop there? Why not make "improper tactics" coextensive with "anything that two out of three judges on a panel don't like," effectively converting this Article III court into the aforementioned super-Citizens' Police Review Board? Regrettably, I see no principled limit to the unwarranted judicial foray into the propriety of law enforcement tactics that Judge Trott's dissent advocates.

er they are voluntary") (emphasis added), *overruled by United States v. Orso*, 266 F.3d 1030 (9th Cir.2001) (en banc).

Perhaps the most crucial point that Judge Trott makes in his dissent, though, is that "[w]hat emerges from *Dickerson* is unmistakable." *Infra*, Dissent from Denial at 17408. Quite so—but not what Judge Trott envisions. What emerges from *Dickerson* is that *Elstad*, as explicated in the limited en banc panel's opinion, is good law; unless a first-obtained, un-Mirandized confession is *involuntary*, a later-obtained, Mirandized confession is not subject to a fruit-of-the-poisonous-tree analysis. *See Dickerson*, 530 U.S. at 441, 120 S.Ct. 2326("Our decision in [*Elstad*] . . . simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."). Admittedly, the Court's analysis of this point in *Dickerson* (all one sentence of it) is less than fully satisfying. But faced with a clear statement of the law from the Supreme Court, our duty is clear: our court must follow. *See State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("Despite what Chief Judge Posner aptly described as *Albrecht*'s 'infirmities, [and] its increasingly wobbly, moth-eaten foundations,' . . . [t]he Court of Appeals was correct in applying [it] despite disagreement with *Albrecht*, for it is this Court's prerogative alone to overrule one of its precedents."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *see also Spector Motor Serv., Inc. v. Walsh*, 139 F.2d 809, 823 (2d Cir.) (L. Hand, J.,

dissenting) ("Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before us."), *vacated sub nom. Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

The constitution neither ordains nor establishes this Inferior court as an oracle of future Supreme Court holdings. Instead, the role that the Founders assigned us is a more humble one, that of simply following the Supreme Court's dictates and applying them to the inhabitants of the Nine Western States. Because that is precisely what our limited en banc opinion in *Orso* does, I concur in the order by which my colleagues decide to follow and to apply *Elstad*, and to refuse full court en banc rehearing in this case.

TROTT, Circuit Judge, with whom Circuit Judges PREGERSON, REINHARDT, HAWKINS, TASHIMA, THOMAS, WARDLAW, FISHER, and BERZON join, Dissenting:

For years, we found ourselves entangled in a spirited debate: Did *Miranda* announce a constitutional rule, or are the *Miranda* warnings merely a lesser species of prophylactic incantations designed to protect the Fifth Amendment's privilege against self-incrimination? In *Dickerson v. United States*, the Supreme Court answered this significant and consequential question, holding that *Miranda* announced a *constitutional* rule, not merely a fungible ritual for which something lesser could be substituted. 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In so holding, the Supreme Court rejected the idea that Congress could override the constitu-

tional strictures of *Miranda* by passing a law (1) designating voluntariness as the touchstone of admissibility of a suspect's in-custody statements, and (2) creating a test wherein the administration of *Miranda* rights to the person interrogated is not dispositive, one way, or the other. *See id.* at 442–43, 120 S.Ct. 2326; *see also* 18 U.S.C. § 3501 (1968). The pesky Cheshire Cat with his § 3501 grin has been chased from the scene.

*Dickerson* clarified that *Miranda* requires law enforcement officers to "warn a suspect in custody of his right to remain silent" prior to any interrogation in order to "assure the suspect that the exercise of that right will be honored." *Dickerson,* 530 U.S. at 442, 120 S.Ct. 2326. What emerges from *Dickerson* is unmistakable. *Before* law enforcement can conduct any non-emergency interrogation, our *Constitution* requires police to tell a suspect in custody that she has, inter alia, a right to remain silent.

Yet, in this case, not only did the United States Postal Service officers violate *Miranda*'s constitutional command by *not* warning Jody Orso of her Fifth Amendment right to remain silent and her right to counsel, they did so wittingly and purposefully. To quote Judge Paez, "[the officers] believed that, unwarned, she would unwillingly incriminate herself." *United States v. Orso,* 266 F.3d 1030, 1040(9th Cir. 2001) (Paez, J., concurring). Remarkably, the interrogators admit as much; Inspector Galetti testified: we "thought that if we *Mirandized* her right away that she might not want to speak to us." *Id.* at 1043. As the en banc court concedes, the inspectors interrogated Orso in flagrant violation of her constitutional rights and privileges, and in a manner calculated to obscure her right to remain silent. This is not a case about an honest mistake or a good-faith belief on the part of the police.

Nor is it a case involving exigent circumstances or a threat to public safety. *Compare New York v. Quarles,* 467 U.S. 649, 655–56, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (police officers faced with a threat to public safety need not administer *Miranda* warnings before asking questions) *with Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (distinguishing clearly investigatory questioning from questions designed to protect public safety).

So, in a deliberately illegal manner, the federal interrogators used a subtle gambit to make her talk. How? By menacing her with phantom accusations instead of advising her of her rights. While she was handcuffed in the back of a police car, her interrogators told her she was possibly facing severe criminal charges and penalties which no evidence supported. They claimed a witness might have seen her with a gun—not true—and therefore she was facing a 25–year prison sentence for armed robbery whereas the maximum penalty for unarmed robbery was only ten years.

This interrogator's trick is not only old, but it is transparent; and moreover, it works. It is a clever psychological ploy designed to leverage the suspect. The interrogator thrusts: "A witness saw you with a gun during the armed robbery. Armed robbery carries a life top. You're in big trouble now." The suspect, pressured to respond, parries: "I didn't have a *gun,* what *armed* robbery?" A suspect placed in this squeeze believes she is helping herself by correcting the interrogator's accusatory deception, but she does so by incriminating herself as to the actual charges she will soon face. The suspect is skewered. *Miranda* itself expressed concerns about inquisitorial techniques such as this where the person interrogated is expected to become desperate and to "con-

fess to the offense under investigation to escape from the false accusations." 384 U.S. at 453, 86 S.Ct. 1602 (1966).

The officers had no lawful alternative but to tell Jody Orso at the outset that *anything* she said could be used against her in court, that she had a right to talk to a lawyer *before* saying a word, and that such a lawyer would come free of charge. Police deception may have a place after the advisement of a suspect's rights, and this tactic may not be enough ipso facto to render a confession involuntary; but this kind of *pre-advice* deception cannot be an acceptable substitute for the affirmative constitutional commands of *Miranda.* To the extent that the advice and waiver process is designed to have a prophylactic purpose and effect, deception in lieu of advice effectively undermines and stifles that purpose.

Jody Orso was tricked into foregoing her rights by the very representatives of the federal government whose constitutional obligation it was to inform her of them. The so-called waiver she signed was executed only a little more than ten minutes after her incriminating statements. If the opinion of my colleagues holds, the practice of purposefully interrogating a suspect without advising her of her rights may become commonplace. The message from *Orso* will resonate far and wide: violate the Constitution, do so intentionally, flout the dictates of the Supreme Court, and nevertheless, the targeted plunder of your purposefully lawless behavior can be used against the victim of the glaring official transgression.

The case relied on by my colleagues that leads them to this doubtful conclusion is *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *Elstad* declined to apply the Fourth Amendment fruit of the poisonous tree doctrine to *Miranda* violations. 470 U.S. at 309, 105 S.Ct. 1285 ("If errors are made ... in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself."); *id.* at 306, 105 S.Ct. 1285 ("The *Miranda* exclusionary rule ... sweeps more broadly than the Fifth Amendment. ..."); *id.* ("[A] procedural *Miranda* violation differs in significant respects from violation of the Fourth Amendment...."); *id.*

Even accepting the holding in *Elstad,* however, that case makes clear, in my reading of it at least, that it excepts "improper tactics" from its mandate. 470 U.S. at 308, 314, 105 S.Ct. 1285. "We must conclude that, absent deliberately coercive *or improper tactics* in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314, 105 S.Ct. 1285 (emphasis added). "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion *or other circumstances calculated to undermine the suspect's ability to exercise his free will,* so taints the investigator's process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309, 105 S.Ct. 1285 (emphasis added). If what the officers did to Jody Orso cannot be described as "improper tactics," calculated to manipulate and to undermine her free will, I do not know what can. The officers admitted intentionally violating the constitutional dictates of *Miranda* for fear that Orso would assert her right to remain silent and her right to an attorney. By the time they *Mirandized* Orso, they had already obtained from her the "breakthrough" information they needed; Orso had already given away the store, and her subsequent "waiver" and confession were

for all practical purposes foreordained. By their deliberate conduct, the officers stripped Orso of the right to know and to rely upon her rights and privileges, and hence, her ability to exercise knowingly her free will. Without question, these tactics were improper, and as such, irreconcilable with *Miranda* and due process of law. *See Pope v. Zenon,* 69 F.3d 1018, 1024 (9th Cir.1995) ("In effect, the tactic of using pre-advice interrogation to open up a suspect worked, which is precisely why we disapprove of it as undermining *Miranda* and the rights *Miranda* seeks to protect."). In this respect, I draw upon another passage from the Supreme Court about inquisitorial interrogation tactics:

> Although sometimes framed as an issue of "psychological fact," the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension. It is telling that in confession cases coming from the States, this Court has consistently looked to the Due Process Clause of the Fourteenth Amendment to test admissibility. The locus of the right is significant because it reflects the Court's consistently held view that the admissibility of a confession *turns as much on whether the techniques for extracting the statements,* as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.

*Miller v. Fenton,* 474 U.S. 104, 115–16, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (citations omitted) (emphasis added). Given every word in the *Miranda* opinion and the Court's clear intent to extend the guarantees of the courtroom to the stationhouse, one would think that the tactics we review in this case are irreconcilable with broadened due process as we currently understand that concept. As far as I am concerned, this case was decided in 1966 when the *Miranda* court said,

> Today, then, there can be no doubt that the Fifth Amendment privilege is available *outside of criminal court proceedings and serves to protect persons in all settings* in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and *the exercise of those rights must be fully honored.*

*Miranda,* 384 U.S. at 467, 86 S.Ct. 1602 (emphases added).

To the extent that there is any ambiguity in *Elstad* regarding the scope of its holding, we should look to *Dickerson* for guidance. *Dickerson* cited with approval the portion of the *Miranda* opinion regarding the problems posed by "menacing police interrogation procedures," including the use of "trickery" in questioning suspects. 530 U.S. at 434–35, 120 S.Ct. 2326 (citing to 384 U.S. at 445–58, 86 S.Ct. 1602). In the cited portion of *Miranda,* the Court rejected the use of such deceptive tactics before warnings were given and stated that "[i]t is not sufficient to do justice by obtaining a proper result by irregular or improper means." 384 U.S. at 447, 86 S.Ct. 1602. Permitting law enforcement to use a confession made shortly after "breakthrough" incriminating evidence has been obtained through improper

police interrogation tactics (including the deliberate failure to inform a suspect of her *constitutional Miranda* rights) is not only an unwarranted expansion of *Elstad,* it actually conflicts with *Miranda*'s original purpose—a purpose re-affirmed in *Dickerson*—to deter deliberately coercive and improper police interrogation practices.

The interrogation-without-advice process we confront here makes it possible for investigators to avoid the usual "threats and promises" methods easily recognized as producing defective waivers and coerced statements. Instead, they can use deceit, guile, and lawbreaking to maneuver around their sworn responsibilities. The grand irony here is that the Supreme Court in *Dickerson* told Congress that it could not substitute by legislation a voluntariness test in place of *Miranda*'s commands, but our limited en banc court's decision gives that very power to the executive branch of our government. We do so by allowing the police to manipulate the voluntariness test and to cancel out their knowing constitutional violations that produced the inculpatory evidence in this case.

After our limited en banc court's decision, there will be reduced incentive for trainers to instruct students at the academies to comply with *Miranda.* Rather, *Orso* provides strong incentive for law enforcement to ignore *Miranda,* interrogate a suspect without overbearing her will, and then rely on *Orso* to sanitize the transgression.

Indeed, *Orso* provides bullet-proof armor to—and may embolden—some determined police trainers who have for years sought to circumvent *Miranda* with impunity. *See* Charles D. Weisselberg, *In the Stationhouse after* Dickerson, 99 Mich. L.Rev. 1121 (2001) (cataloging myriad ways police have devised over the years to

defeat *Miranda*). Our court directly confronted the recurring problem of deliberate state police noncompliance with the Constitution in *California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039(9th Cir.1999). In that case, the cities of Los Angeles and Santa Monica, California apparently had an official policy, set forth explicitly in certain training programs and written materials, "to continue to interrogate suspects 'outside *Miranda*' despite the suspects' invocation of their right to remain silent and their requests for an attorney." *Id.* at 1041. In a get-an-inch, take-a-mile defense of this misguided policy, the defendant cities and police chiefs and their lawyers unpersuasively argued that the policy was justified by the impeachment exception to *Miranda*'s exclusionary rule established in *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) and *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). We made short work of this delusive contention, saying, "[t]he policy of questioning 'outside *Miranda*' appears to be based on the proposition, which we reject, that *Harris* and *Hass* negate the quoted imperatives of *Miranda*." *Butts,* 195 F.3d at 1042. Moreover, we held not only that the method under review violated the Constitution, but that the constitutional prohibition in this respect was so clearly established that a defense of qualified immunity was unavailing. *Id.* at 1041–42. We observed also that the "fact that Los Angeles and Santa Monica may have trained their police to violate the rights of individuals does not provide any defense for these officers." *Id.* at 1049; *see also Henry v. Kernan,* 197 F.3d 1021, 1027 (9th Cir.1999) (holding that a state cannot be permitted to use a defendant's inculpatory statements against him even for impeachment where the statements were the product of a deliberate *Miranda* violation); *Id.* ("We conclude

that the slippery and illegal tactics of the detectives overcame Henry's will and that he continued his confession only as a result of their deception."); *Cooper v. Dupnik*, 963 F.2d 1220, 1226 (9th Cir.1992) (condemning police tactics expressed by one police officer: "You know, whether he asked for an attorney or for his mommy or whatever he asked for, if he asked to remain silent, I wasn't going to stop. We decided it was going to be very clear-cut, forget his Miranda Rights, the hell with it."); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir.1991) (en banc) ("The use of coercive tactics by state law enforcement officers to pressure an arrestee into talking has been prohibited since 1936. *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).").

With *Orso* as it now stands, some law enforcement agencies may be encouraged actively to use techniques we attempted to prohibit in *Butts*. The unintended but clear message to police trainers may be welcomed in some quarters with open arms. Don't advise, interrogate the suspect, violate the Constitution, use subtle and deceptive pressure, take advantage of the inherently coercive setting, and then, after the damage has been done, after the beachhead has been gained, gently advise the suspect of her rights. Heavy-handed coercion is not necessary; all you need to defeat *Miranda* is trickery and deception. If the suspect confesses, the confession will most probably be admissible notwithstanding the flagrant abuse of the Constitution on which it depends. Don't worry if the suspect clams up when *Miranda* is finally administered, that person, if given her rights at the proper time, would not have talked anyway, so nothing gained, but nothing lost. Don't worry about civil suits either, because the damages no longer exist. The *Orsoized* confession, the direct product of the *Miranda* violation, is fully constitutional.

We are either going to require officers to follow *Miranda*, in a normal case, or we are going to look the other way when they find and use a bruiseless and deceptive way around it. *Miranda* provides a bright-line rule that is easy to follow; but either it means what it says, or it does not. The oath an officer, state or federal, takes to uphold the Constitution of the United States either is meaningful, or it is not. This case will decide. *Dickerson* may have closed down one debate, but it appears to have entangled us in another; and we appear again to have miles to go before we sleep.

Fortunately, the vast majority of law enforcement officers will faithfully abide by the law and by *Miranda* simply because that is the right course to follow. But, our cases and our experience demonstrate that, unfortunately, some will not. If our limited en banc court's result is palatable to the Supreme Court, then so be it. After reading what that Court has said over the years about the sanctity of the privilege against self-incrimination and the right to remain silent, and knowing the history of government abuses that led to the Fifth Amendment, however, it appears to me that this case requires a different result. The court has said many times that *Miranda* and its formula must be "scrupulously honored," but here, this decree was unsanctimoniously and unscrupulously disobeyed. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (quoting *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602 (1966)). It is one thing not to allow the fruit-of-the-poisonous-tree doctrine to infect everything that follows a *Miranda* blunder, but it is wholly another to exempt from the reach of the exclusionary rule the deviant tactics used in this case. The conduct here of the federal postal inspector was no different in kind than the official lawless conduct that con-

vinced the Supreme Court in 1914 to adopt in federal court the exclusionary rule as a way to ensure that our basic constitutional rights have more than just a paper existence. We do well to review again the Court's eighty-seven year old statement about the role of the federal courts in this process:

> The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

*Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

The passage I am about to republish has been quoted more times than anyone would care to catalogue. If there is a law student alive who has not read Justice Brandeis's words, I would be surprised. Yet, like all other pearls of wisdom, it seems that it must be repeated to every generation or it gets lost. This statement is the best example I have ever read of a reason that is both pragmatic and principled why government must follow the law:

> In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the adminis-

tration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

Judge Paez's observations about what happened to Jody Orso are accurate. With all respect, however, he and his concurring colleagues stopped short of putting an end to a heretical tactic forged in open defiance of the Supreme Court and the Constitution. Such improper "law enforcement" tactics calculated to overcome the free will of the ignorant, the uncounseled, and the unwitting cannot stand. I appreciate the difficult and sometimes frustrating task that faces well-meaning and hardworking law enforcement officers in their never-ending battle against lawbreakers, but the basic advice of rights debate, fueled in some measure by Congress's failed attempt to shear *Miranda* from its constitutional moorings, is over. Absent a bona fide emergency or a threat to public safety, advice of rights must precede in-custody interrogation conducted for the purpose of eliciting incriminating statements. At this crossroads therefore, the question is whether the rule of law is the law of rules, or not. I respectfully dissent from my colleagues' decision not to rehear as a full court this important case.

*Miranda hic sepultus.*