STATE of Missouri, Respondent,

v.

Patrice SEIBERT, Appellant.

No. SC 84315.

Supreme Court of Missouri,
En Banc.

Dec. 10, 2002.

Amy M. Bartholow, Assistant State Public Defender, Columbia, for Appellee.

Jeremiah W. (Jay) Nixon, Atty. General, Shaun J. Mackelprang, Asst. Attorney General, Jefferson City, for Respondent.

MICHAEL A. WOLFF, Judge.

The question presented here is whether a law enforcement officer's intentional violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in obtaining a statement requires suppression of a second statement, secured after a *Miranda* warning was given, where the second statement was based on the first. Essential to this inquiry is whether the presumption that the first statement was involuntary carries over to the second statement. In the circumstances here, where the interrogation was nearly continuous, the Court holds that the second statement, clearly the product of the invalid first statement, should have been suppressed.

Patrice Seibert was convicted of second-degree murder for her role in the death of Donald Rector in a fire intentionally set in the mobile home where Rector resided. She was sentenced to life imprisonment. On appeal, Seibert asserts the trial court committed reversible error when it allowed the State to introduce inculpatory statements she made while in custody. Seibert did not testify at trial.

After opinion by the Court of Appeals, Southern District, this Court granted transfer. This Court has jurisdiction. Mo. CONST. art. V, section 10. The judgment of the trial court is reversed, and the case is remanded.

## Facts—The Mobile Home Fire and Death of Donald Rector

Seibert lived in a mobile home in Rolla with her five sons. The victim, Donald Rector, 17, who was on medication for a mental disorder, also lived with them. Jonathan, 12, one of Seibert's sons, was seriously handicapped with cerebral palsy. He could not walk, talk or feed himself. On February 12, 1997, Jonathan died in his sleep. Seibert was afraid to report his death. He had bedsores, and she was afraid authorities would believe she had been neglecting him.

In Seibert's presence, two of her teenaged sons and two of their friends discussed a plan to set the mobile home on fire to cover up Jonathan's death. They decided Donald should be present in the fire so it would not look as though Jonathan had been left alone. In her statements, Seibert admitted that Donald, who died in the fire, was supposed to die in the fire. According to the trial testimony of Jeremy, one of her son's friends, Seibert was crying, "pretty much in hysterics," during the discussion with her two sons and their friends. She suggested sending her two younger sons, Patrick and Shawn, to church during the fire. Seibert was not present when the fire started.

Darian, age 17, the oldest of Seibert's sons, and his friend Derrick were to set the fire. Darian testified that Derrick poured gas around the trailer and then hit Donald, who was having a seizure and convulsing on the floor. Derrick set the

fire before Darian was out of the trailer. Darian suffered serious burns to his face. Donald's dead body was found kneeling in front of and partially lying on a sofa in the west bedroom with a penetrating wound on the back of his skull. The cause of death was asphyxiation secondary to exposure to fire.

### The Two–Step Interrogation

On February 17, 1997, five days after the trailer fire, St. Louis County officer Kevin Clinton woke Seibert at 3:00 a.m. She was at a hospital in St. Louis County, where Darian was being treated for burns. Rolla officer Richard Hanrahan arranged for Officer Clinton to arrest Seibert. Officer Hanrahan specifically instructed Officer Clinton not to advise Seibert of her *Miranda* rights.

Once at the police station, Seibert was left in a small interview room for 15 to 20 minutes to "give her a little time to think about the situation." Without issuing a *Miranda* warning, Officer Hanrahan then questioned her for 30 to 40 minutes. He squeezed her arm and repeated the same statement, "Donald was also to die in his sleep," throughout much of the interview. After she made an admission indicating that she knew Donald was to die in his sleep, she was given a 20–minute break for coffee and a cigarette. Officer Hanrahan then resumed the interview, this time using a tape recorder, and advised Seibert of her *Miranda* rights. Seibert signed a waiver form.

Officer Hanrahan began the second stage of the interview by referring to the first stage: "Ok, 'trice, we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" Then, with occasional reference back to the first stage, pre-*Miranda* interview, Officer Hanrahan continued to question Seibert. She repeated statements she had made prior to receiving *Miranda*. This tape-recorded interview was played to the jury at trial.

Officer Hanrahan testified that he made a conscious decision to withhold *Miranda* hoping to get an admission of guilt. He testified that an institute, from which he has received interrogation training, has promoted this type of interrogation "numerous times" and that his current department, as well as those he was with previously, all subscribe to this training. In the second stage of the interview, Officer Hanrahan began by reminding Seibert that they had been "talking for a little while" about the trailer fire, which occurred on February 12. Thus, he was able to link together the unwarned interview with the warned interview. Seibert was reminded of the statements she made during the first stage, which occurred before he gave Seibert a *Miranda* warning. He also used Seibert's pre-warning statements to phrase his questions. For example, consider the following excerpt from the second stage of the interview (emphasis added):

Officer Hanrahan: Now, in discussion you told us, you told us that there was an understanding about Donald. (Here, he is referring to the unwarned portion of the interview.)

Seibert: Yes.

Hanrahan: Did that take place earlier that morning [February 12, 1997]?

Seibert: Yes.

Hanrahan: Ok. And what was the understanding about Donald?

Seibert: If they could get him out of the trailer, to take him out of the trailer.

Hanrahan: And if they couldn't?

Seibert: I, I never even thought about it. I just figured they would.

Hanrahan: Trice, *didn't you tell me that he was supposed to die in his sleep?*

Seibert: If that would happen, 'cause he was on that new medicine, you know....

Hanrahan: The Prozac? And it makes him sleepy. So he was supposed to die in his sleep?

Seibert: Yes.

Officer Hanrahan, in order to secure an admissible confession, used information he gained from Seibert's previous inadmissible confession. As a result, Seibert's post-warning statements were closely tied to the lengthy unwarned interrogation.

## The Purpose and Protections of *Miranda*

To preserve the Fifth Amendment right against self incrimination where an accused is subjected to custodial interrogation, which "exacts a heavy toll on individual liberty and trades on the weakness of individuals," the United States Supreme Court created the now well-known safeguard: the *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436, 455, 86 S.Ct. 1602, 16 L.Ed.2d 694. *Miranda* provided that, "prior to *any questioning*" a person must be informed of certain rights, including the right to remain silent, which can only be waived knowingly, voluntarily and intelligently. *Id.* at 444, 86 S.Ct. 1602 (emphasis added).[1]

■ The *Miranda* requirement serves several purposes. "For those unaware of the privilege, the warning is needed simply to make them aware of it— the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute

prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Id.* at 468, 86 S.Ct. 1602. Beyond providing these protections, the *Miranda* decision and its progeny serve to guide police and deter improper conduct.[2] The Supreme Court granted certiorari in *Miranda* to "give concrete constitutional guidelines for law enforcement agencies and courts to follow."

■ Failure to give a *Miranda* warning does not result in exclusion of a statement for all purposes. An unwarned custodial statement may be used for impeachment. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The prosecution may use the testimony of a witness who was identified by the defendant in a statement given without a *Miranda* warning. *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). And, most pertinent to this case, the Court in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), held that a defendant's prior remark, in answer to a question during the police investigation, does not—"without more"—make a subsequent statement inadmissible after a *Miranda* warning was given. *Elstad*, 470 U.S. at 300, 309, 105 S.Ct. 1285.

■ As *Elstad* and *Tucker* reiterate, the goals of *Miranda* are to deter improper police conduct and to assure trustworthy evidence, specifically evidence that has not been obtained in circumstances that appear to be coercive. *Elstad* dealt with

1. The United States Supreme Court has held that the protection is derived from the Constitution and, thus, not subject to legislative repeal and reaffirmed its applicability to the states. *Dickerson v. United States*, 530 U.S. 428, 438–39, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

2. "*Miranda* has had a tremendously shattering impact upon all levels of the police profession and is, unquestionably, the most significant, far-reaching, and all-encompassing decision in the broad field of criminal justice ever handed down." Arthur S. Aubry, Jr. & Rudolph R. Caputo, Criminal Interrogation 310 (3d ed.1980).

what the Court described as "a simple failure to administer the warnings." 470 U.S. at 309, 105 S.Ct. 1285. There was no intentional violation of *Miranda* in *Elstad,* and the Court held "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.*

But what about circumstances such as this case where the violation of *Miranda* was intentional? An intentional violation of *Miranda* shifts the focus from the goal of gaining trustworthy evidence—though that is still a major concern—to the goal of deterring improper police conduct.

### Intentional *Miranda* Violations

■ The police officer in this case purposefully withheld a *Miranda* warning as part of a two-step interrogation technique designed to elicit an initial confession before reading the accused her rights, hoping that she would repeat that confession. As noted, Officer Hanrahan testified that he made a conscious decision not to advise Seibert of her rights because he was hoping to get an admission from her and specifically asked the arresting officer not to give a *Miranda* warning. Officer Hanrahan characterized the strategy as follows:

> Basically, you're rolling the dice. You're doing a first stage where you understand that if you're told something that when you do read the *Miranda* rights, if they invoke them, you can't use what you were told. We were fully aware of that. We went forward with the second stage, read *Miranda,* and she repeated the items she had told us.

Securing a first admission—no matter how small—is often called the "breakthrough" or "beachhead".[3] Interrogators are taught that procuring the first admission is the "biggest stumbling block" that, once overcome, usually leads to a full confession. "The subject must be motivated to make the first admission, no matter how apparently small or trivial," according to ARTHUR S. AUBRY, JR. & RUDOLPH R. CAPUTO, CRIMINAL INTERROGATION 290 (3d ed.1980). "If this admission is related to the crime and to the subject matter of the interrogation, there is every reason to expect that the first admission will lead to others, and eventually to a full confession."

Once the officer has the initial admission, the officer uses "skillfully applied interrogation techniques" to "motivate the suspect into making the confession." *Id.* at 26. One of these techniques is to confront the suspect with the earlier admission, which is what occurred in this case.

If a *Miranda* warning precedes the interrogation, this is a perfectly legitimate technique. But in this case, the interrogation proceeded without the required warning, and then after the first admission was made, only a short break and then a *Miranda* warning interrupted the interrogation.

This was undeniably an "end run" around *Miranda.* When an officer chooses to use this tactic, the officer should, under *Miranda,* understand the risks of doing so. The biggest risk is that the prosecution may not be able to use the statement in its case in chief. That risk, of course, may be weighed against the desirability of getting information, such as the names of witnesses or location of physical evidence. And it may well be, under circumstances that differ from those in this case, that the prosecution may nevertheless be able to show that the confession

**3.** See ROBERT F. ROYAL & STEVEN R. SCHUTT, THE GENTLE ART OF INTERVIEWING AND INTERROGATION 143 (1976).

was voluntary despite the *Miranda*-based presumption to the contrary.

**Voluntariness of the Subsequent Admission**

 Upon finding an intentional *Miranda* violation, a court must ascertain whether the warned statement was voluntary. In doing so, the court examines the facts and circumstances to "determine the degree of causal connection between any unconstitutional conduct (and the statement resulting therefrom) and the confession made later." *State v. Fakes,* 51 S.W.3d 24, 30 (Mo.App.2001) (citing *State v. Wright,* 515 S.W.2d 421, 426 (Mo. banc 1974)). The court should ascertain whether the purpose of the violation was to "undermine the suspect's ability to exercise his free will." *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285.

In light of the record in this case, this Court presumes the violation of *Miranda* was a tactic to elicit a confession and was used to weaken Seibert's ability to knowingly and voluntarily exercise her constitutional rights. If the truth were otherwise, Officer Hanrahan would not have specifically instructed the arresting officer to refrain from giving a *Miranda* warning. He wanted to secure a "breakthrough" admission before warning Seibert of her rights because he feared that she would assert those rights were she made aware of them.

Another important consideration in determining voluntariness is the proximity in time and place of the subsequent confession. If the warned confession is far enough removed from the first confession, the accused more likely made a voluntary decision to speak again. While each situation is fact-specific, courts can look to whether the subsequent confession closely followed the first and was obtained by the same officials in the same surroundings. For example, in the case at bar, Seibert was questioned for 30 to 40 minutes, in an intense manner. She became emotional during the interview and, at one point, Officer Hanrahan squeezed her arm and repeatedly stated, "Donald was to die in his sleep." He continued in this manner until Seibert agreed that Donald was supposed to die in the fire. Then, after a 20-minute break, Seibert was read and waived her *Miranda* rights. The same officers interrogated her in the same room only minutes after her unwarned confession. It was at this point that she confirmed her unwarned statements.

In these circumstances, little if any weight can be given to the fact that Seibert signed a *Miranda* waiver.[4] In *State v. Fakes,* the court of appeals suppressed a similar confession. Fakes was interrogated at length while at the police station before receiving the *Miranda* warning. The interrogation was intense, and officials did not give Fakes a *Miranda* warning until she became emotional. *Fakes,* 51 S.W.3d at 32. In suppressing Fakes' post-*Miranda* confession, the court questioned the voluntariness of Fakes' *Miranda* waiver: "In view of the fact that she was so extensively interrogated before she was advised of her rights, it is not as clear as in *Wright* and *Elstad* that she later voluntarily waived those rights when, after finally having been advised of her rights, she confirmed the statements made earlier." *Id.* at 33. In situations such as these, where the accused is subjected to a nearly

4. This is true even though Officer Hanrahan read each part of *Miranda* to Seibert, having her orally express her understanding of each right independently and then instructing her to initial and sign a waiver form. Adherence to such formality 30 minutes into the interrogation does not change the fact that she was subjected to a nearly continuous interrogation, which began without a proper *Miranda* warning.

continuous period of interrogation, it is unreasonable to assume—and there is nothing in the record to support such an assumption—that the simple recitation of *Miranda* would resurrect the opportunity to obtain a voluntary waiver.

The Eighth Circuit, in *United States v. Carter*, suppressed a written confession, which was executed after an initial unwarned interrogation that was followed by a *Miranda* warning. In *Carter*, postal inspectors interrogated the suspect, without giving the *Miranda* warning, about his alleged possession of stolen mail for nearly an hour before he confessed. The interrogation took place in the bank president's office, in the building where Carter worked, with Carter seated between the two inspectors. *United States v. Carter*, 884 F.2d 368, 372 (8th Cir.1989). The court found the second warned confession "came almost directly on the heels" of the first unwarned confession and that the unwarned confession, subsequent warnings and confession were "part and parcel of a continuous process." *Id.* at 373.

When presented with different circumstances, the result may be different. In *Wright*, for example, the accused was brought into the interrogation room while the officer was questioning another suspect. Without first advising Wright of his constitutional rights, the officer asked him, "What did you do with the shotgun?" or words to that effect. Wright replied, "Leroy, you know I gave you the shotgun. I don't know where it is at." The officer advised Wright not to make any further statements. Wright was then placed in juvenile custody. *Wright*, 515 S.W.2d 421, 423 (Mo. banc 1974). In finding that Wright's subsequent statements were not coerced, the court noted the second interrogation was held the following day, at a different location (the juvenile building instead of the police station), and with differ-

ent people present (Wright's mother and juvenile officers). *Id.* at 427.

*Elstad* also is distinguishable in that there was no evidence, as in the instant case, that the breach of *Miranda* was part of a premeditated tactic to elicit a confession. "The arresting officers' testimony indicates that the brief stop in the living room before proceeding to the station house was not to interrogate the suspect, but to notify his mother of the reason for the arrest." *Elstad*, 470 U.S. at 315, 105 S.Ct. 1285. The *Elstad* court did not find that the police engaged in "improper tactics".

Here, however, Officer Hanrahan candidly admitted that the breach of *Miranda* was intentional and part of a tactic to elicit a confession. It is presumed that this strategy was used to weaken Seibert's ability to knowingly and voluntarily exercise her constitutional rights. Further, a 20–minute break and *Miranda* warning separating the unwarned confession from the warned confession was not enough to disturb the continuity of the interrogation where Officer Hanrahan tied the two stages of the interview together by using her statements in the first stage to correct her during the second stage.

Officer Hanrahan's intentional omission of a *Miranda* warning was intended to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights. Both stages of the interview formed a nearly continuous interrogation—she was interrogated by the same officials in the same place with only minutes separating the unwarned and warned questioning. There are no circumstances that would seem to dispel the effect of the *Miranda* violation. For these reasons, Seibert's post-*Miranda* waiver and confession was involuntary and, therefore, inadmissible. To hold otherwise would encourage fu-

ture *Miranda* violations and, inevitably, *Miranda's* role in protecting the privilege against self-incrimination would diminish. Were police able to use this "end run" around *Miranda* to secure the all-important "breakthrough" admission, the requirement of a warning would be meaningless. Officers would have no incentive to warn, knowing they could accomplish indirectly what they could not accomplish directly.[5] Almost 20 years ago, in his *Elstad* dissent, Justice Brennan predicted in what the *Elstad* majority described as an "apocalyptic tone" that *Elstad* would deliver a "crippling blow" to *Miranda*. *Elstad*, 470 U.S. at 318 n. 5, 319, 105 S.Ct. 1285. Brennan warned that *Elstad* gave authorities "every incentive . . . to interrogate suspects without warnings or an effective waiver, knowing that the fruits of such interrogations 'ordinarily' will be admitted, that an admissible subsequent confession 'ordinarily' can be obtained simply by reciting the *Miranda* warnings shortly after the first has been procured and asking the accused to repeat himself. . . ." *Id.* at 358, 105 S.Ct. 1285. And, as evidenced by the testimony of Officer Hanrahan, officers not only have incentive to intentionally interrogate suspects without administering *Miranda*—they are being trained to do so. The *Elstad* majority, however, said Brennan's apocalyptic prediction—which is what happened in this case—would not result. "Justice Brennan not only distorts the reasoning and holding of our decision, but, worse, invites trial courts and prosecutors to do the same." *Id.* at 318 n. 5, 105 S.Ct. 1285.

## Prejudice

■ Because the trial court erred in admitting Seibert's post-*Miranda* confession, the case should be reversed and remanded for a new trial unless the error was harmless. *State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983). Seibert was convicted of second degree murder as an accessory for knowingly killing Donald Rector. The jury was able to both read and hear her statements that she knew the mobile home was to be burned and that Donald could die in his sleep because he was on Prozac. At one point, she agreed with Officer Hanrahan that Donald was supposed to die in his sleep after he reminded her of her pre-*Miranda* confession. Because of the evidentiary strength of a confession,[6] and because of the contents of Seibert's involuntary statements, her statements certainly were not harmless.

## Conclusion

The interrogation was set up to violate *Miranda* to secure a confession. The trial court suppressed only the unwarned portion of the interrogation. But on this record, the prosecution has not overcome the presumption that this tactic produced an involuntary confession. The confession in the remaining portion of the interrogation also should have been suppressed.

The judgment is reversed, and the case is remanded for a new trial.

---

5. *See* Robert M. Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 CALIF. L.REV. 579, 620 (1968).

6. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.' " *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

WHITE, STITH and TEITELMAN, JJ., concur.

BENTON, J., dissents in separate opinion filed.

LIMBAUGH, C.J., and PRICE, J., concur in opinion of BENTON, J.

DUANE BENTON, Judge.

Because the principal opinion does not follow the binding precedent, *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), I dissent.

*Elstad* holds that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving [her] rights and confessing after [she] has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318, 105 S.Ct. at 1298, 84 L.Ed.2d at 238. Patrice Seibert's unwarned responses to Officer Hanrahan's questioning did not prevent her from waiving her rights and confessing.

"In these circumstances [where the preceding admission is unwarned but voluntary], a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Elstad*, 470 U.S. at 310–311, 105 S.Ct. at 1294, 84 L.Ed.2d at 233. In this case, the administration of *Miranda* warnings was careful and thorough, as demonstrated by the tape recording of the administration, and by the form that Seibert initialed, dated and signed. As in *Elstad*, the reading of Seibert's rights was undeniably complete and recorded. *Elstad*, 470 U.S. at 314–315, 105 S.Ct. at 1296, 84 L.Ed.2d at 236. Moreover, Seibert was 39 years old when she confessed. Appendix A to this opinion is the "Warning & Waiver Form." Appendix B is the testimony discussing it.

"A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314, 105 S.Ct. at 1296, 84 L.Ed.2d at 235. The *Miranda* warnings given Seibert "ordinarily" should make her later confession admissible.

"Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232. In this case, Seibert's unwarned admissions were suppressed. The circuit court found that the warned statement was knowingly and voluntarily made. "In reviewing preserved error relating to a trial court's order on a motion to suppress evidence, the facts and reasonable inferences from such facts are considered favorably to the trial court's ruling, and contrary evidence and inferences are disregarded." *State v. Galazin*, 58 S.W.3d 500, 507 (Mo. banc 2001).

"It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise [her] free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232. In this case, there was no "actual coercion" of Seibert, or "other circumstances" that undermined her free will. *Elstad* holds flatly that the "psychological impact of voluntary disclosure of a guilty secret" is not coercion, nor does it compromise the voluntariness of a subsequent informed waiver. *Elstad*, 470 U.S. at 312, 105 S.Ct. at 1294, 84 L.Ed.2d at 234. The *Elstad* opinion disapproves such

"cat out of the bag" logic as "expansive." *Id.*

"[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296, 84 L.Ed.2d at 235. In Seibert's case, there were no deliberately coercive tactics. No firearms were produced, or shown to Seibert during her interrogation. There were no threats in any way, nor physical or verbal abuse. The conversation was in "very low conversational tones." No inducements or promises were made. There is no evidence of deliberately coercive tactics.

The principal opinion distinguishes *Elstad,* noting that in that case there were no "improper tactics." In Seibert's case, the principal opinion finds improper tactics, when it presumes that the officer intended to deprive her "of the opportunity knowingly and intelligently to waive her *Miranda* rights."

If there were substantial evidence that the officer did the following—"inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke [her] rights once they are read to [her]"—then the warned confession should be suppressed. See *Elstad,* 470 U.S. at 317, 105 S.Ct. at 1297, 84 L.Ed.2d at 237.

At this critical point, the majority presumes that the officer's strategy had the purpose "to weaken Seibert's ability to knowingly and voluntarily exercise her constitutional rights." No evidence supports this assumption. Seibert did not testify at any hearing or at trial. Officer Hanrahan testified at the hearing that his "hope" and "intent" were to gain some sort of confession or admission of guilt. The

officer did not mention "breakthrough" or "beachhead" interrogation. In addition to the "rolling the dice" paragraph quoted in the principal opinion, Officer Hanrahan testified that withholding *Miranda* rights at the outset means:

A. You may not get any information at all.

Q. In which part of the interrogation?

A. In either part. You may never even get to the second stage.

Officer Hanrahan testified that based on two prior conversations with Seibert, he believed she expected to be arrested and would have a story rehearsed. Although defense counsel asked Officer Hanrahan about interrogation techniques at both the suppression hearing and the trial, the Officer—the only witness to testify about the confession—stated that his hope and intent was to gain a confession or admission.

*Elstad* expressly commends confessions: "Voluntary statements 'remain a proper element in law enforcement.'" *Elstad,* 470 U.S. at 305, 105 S.Ct. at 1291, 84 L.Ed.2d at 229, quoting *Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1630. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.... Absent some officially coerced self-accusation, the Fifth Amendment is not violated by even the most damning admissions." *Elstad,* 470 U.S. at 305, 105 S.Ct. at 1291, 84 L.Ed.2d at 229. "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Elstad,* 470 U.S. at 312, 105 S.Ct. at 1294–95, 84 L.Ed.2d at 234

*Elstad* invokes cases holding confessions voluntary, even though police falsely stated that a codefendant turned State's evi-

dence, or although the defendant did not know that a prior coerced confession could not be admitted. *Elstad,* 470 U.S. at 317, 105 S.Ct. at 1297, 84 L.Ed.2d at 237. See also *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (police failed to tell suspect of attorney's efforts to reach him; confession admitted, after voluntary waiver); *Oregon v. Mathiason,* 429 U.S. 492, 495–96, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (police falsely told suspect his fingerprints found at scene, not *Miranda* violation). "*Miranda* forbids coercion, not mere strategic deception.... Ploys to mislead a suspect or lull [her] into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243, 251 (1990). Placing an undercover agent near the suspect in order to gather incriminating information is permissible under the Fifth Amendment. *Hoffa v. United States,* 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374, 383 (1966).

The principal opinion, in emphasizing the factors of lapse-of-time, change-of-place, change-of-interrogators, and need-to-dissipate-taint, echoes the Oregon court reversed in *Elstad,* and the other courts criticized in *Elstad. Elstad,* 470 U.S. at 303, 310, 317–18, 105 S.Ct. at 1290, 1293, 1297, 84 L.Ed.2d at 228, 233, 237. *Elstad* makes clear that these factors are considered only if the first confession is coerced. *Id.*

*Elstad* is still binding precedent. *Elstad* was approved in *Dickerson v. United States,* 530 U.S. 428, 441, 120 S.Ct. 2326, 2335, 147 L.Ed.2d 405, 418 (2000). The United States Supreme Court re-affirmed that the traditional "fruits" doctrine developed in Fourth Amendment cases does not apply to unwarned interrogation under the Fifth Amendment. *Id.* The holding of

*Dickerson* is: "*Miranda* and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Dickerson,* 530 U.S. at 432, 120 S.Ct. at 2329–30, 147 L.Ed.2d at 412. This "progeny" includes the *Elstad* case, as demonstrated by *Dickerson's* express discussion of *Elstad* (summarized above), and by *Dickerson's* implicit approval: "If anything, our subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement while reaffirming the decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief." *Dickerson,* 530 U.S. at 443–44, 120 S.Ct. at 2336, 147 L.Ed.2d at 420.

The principal opinion asserts that *Elstad* does not apply where police intentionally withhold *Miranda* warnings before the initial unwarned statement. True, *Elstad,* at one point, describes the initial unwarned statement as "technically in violation of *Miranda.*" *Elstad,* 470 U.S. at 318, 105 S.Ct. at 1297–98, 84 L.Ed.2d at 238. This passing comment in *Elstad* does not support the principal opinion, as demonstrated in recent opinions by the Courts of Appeals.

On facts nearly identical to this case, the United States Court of Appeals for the Ninth Circuit, *en banc,* held that *Elstad* applies so long as the initial unwarned statement is not actually coerced. *United States v. Orso,* 266 F.3d 1030, 1035, 1039 (9th Cir. en banc), *full en banc hearing denied,* 275 F.3d 1190 (2001). The United States Supreme Court denied *certiorari* on the *Orso* case, while this case was pending. —— U.S. ——, 123 S.Ct. 125, 154 L.Ed.2d 42 (2002).

It is also true that the Eighth Circuit has made statements to the contrary. *United States v. Carter,* 884 F.2d 368, 372–74 (8th Cir.1989). However, yet another

Circuit, the First, called *Carter's* statements "dicta" and "facially inconsistent with the Supreme Court's holding in *Elstad*." *United States v. Esquilin*, 208 F.3d 315, 320 (1st Cir.2000). The First Circuit then holds that deliberate withholding of *Miranda* rights before the unwarned admission does not make a later warned statement inadmissible. *Id.* at 320–21. Directly refuting the principal opinion's reliance on "deterrence" against "improper tactics," the First Circuit holds:

> Although *Elstad* does not permit suppression of Esquilin's voluntary statement made after he was informed of his *Miranda* rights and voluntarily waived them, the basic *Miranda* rule still operates here to render Esquilin's initial unwarned (but voluntary) statement inadmissible. The Supreme Court has ruled that *Miranda's* deterrence rationale requires no more than that, see *Elstad*, 470 U.S. at 308, 105 S.Ct. 1285, 84 L.Ed.2d 222, and we are not free to ignore that judgement.

*Id.* at 321. The *Esquilin* case also specifically holds that *Elstad* rejects the "nearly continuous" and "time lapse" arguments, both invoked by the principal opinion. *Id.* at 319.

As for the other authority the principal opinion discusses, *Elstad* renders obsolete the contrary approach in this Court's decision eleven years earlier in *State v. Wright*, 515 S.W.2d 421, 426–27 (Mo. banc 1974), and in the Court of Appeal's decision last year in *State v. Fakes*, 51 S.W.3d 24, 30 (Mo.App.2001).

Once the questions of law are resolved, it is clear that the trial judge should be affirmed. "When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence, and deference is given to the trial court's superior opportunity to determine credibility of witnesses." *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc), *cert. denied*, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). On this record, there is substantial evidence that both the unwarned and warned statements were voluntary. Thus, under *Elstad*, the warned statement is admissible, as the trial judge ruled.

## APPENDIX A

227 S. Central, Clayton
Div Crim Invest.
St. Louis Co. P.D. ST. LOUIS COUNTY DEPARTMENT OF POLICE

### WARNING & WAIVER FORM

Before we ask you any questions, you must understand what your rights are:

1. You do not have to make any statement at this time and have a right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You are entitled to consult with an attorney before any interview and to have an attorney present at the time of interrogation.

4. If you cannot afford an attorney, one will be appointed for you.

_____ 5. (Juvenile Suspects Only) If you are fourteen years of age or older you could be tried in court as an adult.

I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_X Patricia A. Seibert_____ _X February 17, 1997_ __4:30am__
Signature of Suspect Date Time

_____ _____ _____
Witness Date Time

I hereby certify that the foregoing Warning and Waiver was read by me to the above suspect, that the suspect also read it, and the suspect has affixed his (her) signature hereto in my presence.

_____ 989
Signature - Police Officer

_____ 1474
Witness (In the case of a juvenile suspect, the attending Deputy Juvenile Officer)

F-162R

## APPENDIX B

Trial Testimony of Officer Richard E. Hanrahan (Excerpt of Transcript March 28, 2000, Pages 917, line 18—920, line 15)

Q. When you arrived at the station, you had an initial conversation with her—is that correct?

A. That's correct.

Q. After that initial conversation did you inform the Defendant of her rights under the Miranda decision?

A. Yes, I did.

Q. I'd like to hand you what's been marked as State's Exhibit 37 and ask you if you can tell me what this is please?

A. Yes, sir—this is a rights advisement provided by the detective with St. Louis County that night.

Q. And was that, in fact, read to the Defendant?

A. Yes, sir, it was.

Q. And did you ask her if she understood each of those rights as you read them to her?

A. As I read them to her, I simply check-marked them when I was finished. I asked her if she understood each right.

Q. Did she indicate to you in some fashion whether she did or not?

A. Yes, she did.

Q. And what was her response in each case?

A. She indicated that she understood and she signed next to each of the rights to state that she understood.

Q. And sir, did you then read the waiver portion of the form?

A. I believe I let her read the waiver. I'd have to check my report to be sure. I usually allow the suspect to read the waiver.

Q. How does that waiver read?

A. It says—"I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Q. In fact, did you threaten the Defendant in any fashion?

A. I did not.

Q. Did you display a weapon or threaten a weapon—I mean, you can do things that are non-verbal. Did you do anything that would be taken as threatening by the average person?

A. I don't believe so—no, sir.

Q. Did you promise the Defendant any benefit of any kind in order to induce her to speak with you?

A. The truth would make her feel much better.

Q. Was that all you said?

A. I believe so. I told her I believed that she was lying and the lie was hurting her.

Q. Sir, did you, in fact, ask her to sign that form if she understood her rights and agreed to speak with you?

A. Yes, sir, I did.

Q. And did the Defendant do so in your presence?

A. Yes, sir, she did.

Q. Would you point out her signature to the Court please?

A. (Complies)

Q. And sir, did you sign that form yourself as a witness?

A. Yes, sir, I did.

Q. And was anyone with you who also signed that form?

A. Fire Marshal Rodger Windle was also there.

Q. And are both your signatures then present on that form as witnesses to her signature and waiver of having been informed and waiving her rights?

A. Yes, sir, they are.

Q. Would you point out your signature and Officer Windle's signature please?

A. (Complies)